198 Cal.App.3d 10 (1988)
243 Cal. Rptr. 580
THE PEOPLE, Plaintiff and Respondent,
v.
CHRISTOPHER ADAMS, Defendant and Appellant.
Docket No. A035297.
Court of Appeals of California, First District, Division Two.
January 29, 1988.
*12 COUNSEL
Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, John Plotz, Deputy State Public Defender, for Defendant and Appellant.
John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Frances M. Dogan and Rene A. Chacon, Deputy Attorneys General, for Plaintiff and Respondent.
[Opinion certified for partial publication.[*]]
OPINION
BENSON, J.
Christopher Adams appeals from a judgment of conviction based upon a jury finding him guilty of one count of oral copulation, two counts of rape and one count of assault with force likely to cause great bodily injury. (Pen. Code, §§ 288a, subd. (c), 261, subd. (2), 245, subd. (a)(1).)[1] Appellant admitted two prior convictions. He was sentenced to an eight-year upper term for rape, two consecutive middle terms of two years each for the second rape and forcible oral copulation and a two-year enhancement for two prior convictions. An additional three-year term for assault was stayed. Appellant contends it was prejudicial error to exclude evidence that the victim had falsely accused others of rape, to permit cross-examination of appellant about his conversations with his attorney and about his attorney's legal strategy and to allow an expert to testify as to the victim's truthfulness at trial. We reverse the judgment.
Evidence produced at trial revealed that in the early morning hours of December 13, 1985, 17-year-old Naomi P. was riding the No. 15 Third Street San Francisco bus to her home from a concert she had attended in *13 Oakland. Appellant, whom she did not know, was on the same bus. Naomi first noticed appellant when she pointed out Geneva Towers to him in response to his request for directions. When Naomi got off the bus at Schwerin Street, appellant did too.
Naomi testified appellant approached her and asked her if she smoked "weed" or "base." She replied "no" and crossed the street. Appellant grabbed her by the throat with one hand and held something sharp to her throat with the other hand. He pushed her against an automobile and told her she had killed his father, but she denied it. It was hard for her to talk because he was choking her. Appellant then dragged her along in a headlock. When she tried to get away, he threw her to the ground and threatened to kill her if she tried to flag someone down.
Appellant took Naomi to a nearby school yard and sat down with her. After some irrational talk, he asked her for her name, address and telephone number and for her mother's name. Frightened, she gave the truthful answers. Appellant led Naomi to the second landing of a stairwell. There, appellant stated his intention to have sex with her. He put his coat on the stairs, pulled down her pants, orally copulated her and had intercourse with her twice without her consent. Naomi then asked appellant for a comb. He said he did not have one but he helped her dress and patted her hair with his hand. He walked her back to the street and again asked for her telephone number. Then he said, "Well, I am going home, I am going to Sunnydale."
Naomi ran home to Geneva Towers where she told her mother and stepmother she had been raped. Her mother called the police. The police took her to the school yard and then to the hospital.
Six days later, Naomi saw appellant going into a bar. She called the police. The police took her and her stepmother to the bar but appellant was not there. She then pointed out another building she had seen him enter. The police went in that building and came out with appellant whom Naomi identified.
Naomi also testified that sometime before trial, her next door neighbor, Ernestine Pollard, gave Naomi a message from appellant suggesting that appellant would pay Naomi not to testify in court. Naomi informed the district attorney who sent an investigator to interview Ernestine Pollard.
Naomi denied she had told her neighbors inconsistent stories. She had not told them her assailant dragged her by her hair, or had intercourse with her on the grass, or that five men raped her, or that she was heavily intoxicated from drugs during the incident.
*14 Naomi's stepmother testified that in the early morning hours of December 14, 1985, she was awakened and found Naomi in the bathroom rinsing her soiled panties while sobbing and shaking. Naomi told her stepmother she had been raped. Her stepmother also testified she was present on December 20, 1985, when Naomi identified appellant as her assailant. Naomi was shaking and crying when she identified appellant to the police.
Obstetrician-gynecologist Bonnie Dattel testified she examined Naomi the morning the incident was reported. Dr. Dattel, a specialist in the field of emergency treatment of child and adolescent sexual abuse victims, found the presence of sperm in Naomi's vagina but did not find any bruising on Naomi's body. Dr. Dattel took an oral history from Naomi concerning the circumstances of the rape. Naomi seemed angry and responded to the questions in a straightforward fashion. Dr. Dattel testified it is not unusual for rape victims to behave in a frivolous or inappropriate fashion following sexual assault. In the doctor's opinion, Naomi's concern about her hair and her truthful responses to appellant's questions were not unusual behavior. The doctor also stated it was not unusual for discrepancies in detail to exist between police reports and medical report narratives of the same event. She also testified that the lack of bruising did not necessarily mean Naomi was not choked.
Appellant testified on his own behalf, admitting two prior felonies of grand theft and breaking into a warehouse. On December 13, 1985, appellant was on a bus traveling to a friend's house to spend the night. Earlier that night, he had been at the Waterloo Club and then the Tick-Tock with some friends. He was carrying about four grams of cocaine with him that night.
As the bus came to the corner of Schwerin and Visitation Streets, appellant asked if this was the Tower stop. The bus driver said yes and Naomi, who was walking to the front of the bus, said yes also. Appellant and Naomi both got off the bus. Naomi was walking in front of appellant when she turned suddenly and asked him if he had a match. He gave her one and she asked if he lived around there and he responded yes, sometimes. She asked him where he was coming from and he responded a party and made a gesture indicating he had sniffed cocaine. Naomi asked him if he had any cocaine and he told her yes, good cocaine. Naomi invited him to a friend's place. Appellant refused and asked what he would get out of the deal. Naomi offered appellant sex, suggesting they go over to the school. Appellant said that would work. Appellant denied grabbing or choking Naomi.
They sat on some stairs in the school yard and talked for a while. Appellant promised to give Naomi about half a gram of cocaine. Naomi said, "Let's get it over with."
*15 Appellant laid his coat down on the stairs and Naomi took off her pants. With her consent, he orally copulated her and they had intercourse. Naomi then urinated. Both of them then moved away a bit and had sexual intercourse again.
When appellant got up, she asked him where the cocaine was. He told her to put herself together and he helped her pat down her hair. While they walked to the middle of the school yard, he said he would like to see her again and again asked for her telephone number which she gave him. As they walked out of the school yard and to within a block of the Geneva Towers where she lived, Naomi continued to ask about the cocaine. She appeared to appellant as if "she [were] desperate or something." Appellant said: "Bitch, you ain't got nothing coming, I am going." She said: "The next time I see you you are going to get yours, nigger" and trotted off.
Sixteen-year-old Tamara Atkins testified for the defense. Atkins, Naomi's neighbor, lived across the hall from Naomi with her two-year-old daughter, her aunt Ernestine Pollard and cousins Diedra Pretre and Rhonda Pollard. Atkins testified Naomi told her that she was high from smoking cocaine and drinking wine cooler the night she was raped. Naomi also told her two different versions of the rape. One version involved one assailant; another version, recounted one month after the incident, involved five male assailants. Atkins also testified that Naomi had a bad reputation in the community for being truthful.
Eleven-year-old Diedra Pretre testified Naomi told her she had been attacked by a man who grabbed her by the hair and dragged her to the grass where he raped her.
Ten-year-old Rhonda Pollard testified that Naomi told her the assailant was wearing a mask and grabbed her by the hair and pulled her to the schoolyard. Naomi also reported she felt a big knife behind her neck.
Ernestine Pollard testified that appellant telephoned her twice regarding the case. After the second call, Pollard approached Naomi and relayed to her that appellant had asked her to tell the truth. Pollard said appellant did not offer money for the favor. Pollard also testified that as Naomi went to get ready for the concert, she heard Naomi say she was going to use drugs the night of the concert. When Pollard saw Naomi shortly after the incident, Naomi appeared to Pollard to be "loaded." Pollard also testified Naomi had a bad reputation for truthfulness.
In rebuttal, Naomi again took the stand and denied she had told anyone she intended to get "loaded," that her assailant wore a mask, or that five men raped her.

*16 I
During defense counsel's questioning of Tamara Atkins, the following colloquy took place: "Q. Do you know a man named Craig? [¶] A. Yes, he is my cousin. [¶] Q. Do you know if Naomi has ever lied about being raped before? [¶] [PROSECUTOR]: Excuse me, your honor, that calls for speculation, it is also irrelevant and calls for hearsay. [¶] [DEFENSE COUNSEL]: Let me rephrase that. [¶] THE COURT: Well, I take it you are withdrawing the question? [¶] [DEFENSE COUNSEL]: Yes. [¶] Q. Tamara did Naomi ever tell you that in January Craig raped her? [¶] A. Yes, she did. [¶] [PROSECUTOR]: Your honor, could we approach the bench? [¶] THE COURT: Yes. [¶] (Off the record.) [¶] [PROSECUTOR]: That objection is sustained, your honor? [¶] THE COURT: Yes. [¶] [PROSECUTOR]: I would move to strike the question and answer. [¶] THE COURT: It will go out. The jury is admonished to disregard the last question and last answer of the witness. It is stricken from the record. You are not to consider it in your deliberations."
A settled statement on appeal signed by the trial judge has been filed in this matter. With respect to the unrecorded bench conference referred to above, the statement provides in pertinent part as follows: "[Prosecutor] objected to the introduction of any evidence of specific acts of misconduct by Naomi ... to impeach her. [Defense counsel] replied that she intended to introduce evidence of two instances in which [Naomi] had falsely accused other men of raping her, these being specific acts of dishonesty. The court sustained the objection."
(1a) Appellant claims it was error for the trial court to exclude evidence that Naomi had falsely accused others of rape. Appellant points out that his defense was that Naomi consented to sex in exchange for cocaine and that when appellant refused to give her the drugs, she accused him of rape in retaliation. He contends the evidence was admissible to show Naomi's character trait of dishonesty and, more specifically, her practice of falsely accusing other persons of rape.
Appellant relies on the holding in People v. Wall (1979) 95 Cal. App.3d 978 [157 Cal. Rptr. 587], a decision of the first division of this district. In Wall, a prosecution for forcible rape, the trial court, under Evidence Code section 787,[2] excluded evidence that the victim threatened to make a false accusation of rape against her former boyfriend. The appellate court *17 reversed holding that the evidence is admissible under Evidence Code section 1103, subdivision (a)(1).[3]
(2) The People assert the evidence was properly excluded because the testimony fails to overcome a basic hearsay objection. As appellant points out in his reply brief, the settled statement on appeal states that the objection to the testimony at trial was that the victim could not be impeached by evidence of specific acts of misconduct rather than a hearsay objection. The People cannot now substitute a new objection. Failure to raise the competency hearsay objection at trial constitutes a waiver of that objection. (3 Witkin, Cal. Evidence (3d ed. 1986) Introduction of Evidence at Trial, § 2020, pp. 1980-1981.)
(1b) The People also rely on the decision in People v. Jones (1984) 155 Cal. App.3d 153, 182-183 [202 Cal. Rptr. 162], which criticizes the Wall decision and holds that such evidence is made inadmissible by Evidence Code section 787. (See also 2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 28.1, p. 847.) This dispute as to whether section 1103 or section 787 of the Evidence Code controls the admission of this evidence must now be analyzed in light of the "Truth-in-Evidence" provision of Proposition 8 passed by the People of this state in June 1982. (Cal. Const., art. I, § 28, subd. (d).)[4]
In People v. Taylor (1986) 180 Cal. App.3d 622, 632 [225 Cal. Rptr. 733], the reviewing court held that the Truth-in-Evidence provision of Proposition 8 had the effect of repealing Evidence Code section 790 which prohibits admission of evidence of good character of a witness for truth and honesty to support his or her credibility unless evidence of the witness's bad character has been introduced to impeach his or her credibility. That court recognized the potential implications of its decision on other Evidence Code sections but specifically left open the question of whether section 787 of the *18 Evidence Code remains valid after passage of Proposition 8. We now decide that it does not.
In so holding we are persuaded by the reasoning of the court in Taylor that a careful reading of Proposition 8 and the ballot summaries and arguments in support of the proposition shows "no intent ... to convict the innocent. Section 28(d) was not designed to liberalize the rules of admissibility only for evidence favorable to the prosecution while retaining restrictions on the admissibility of evidence tending to prove a defendant's innocence, but to ensure that those who are actually guilty do not escape conviction through restrictions on the admissibility of relevant evidence. If section 28, subdivision (d) has the effect of admitting evidence favorable to defendant that would previously have been excluded, it is attributable to the plain language used by the drafters, and not to our construction of the provision. (In re Lance W. [1985] 37 Cal.3d [873], 887, fn. 7 [210 Cal. Rptr. 631, 694 P.2d 744].)" (People v. Taylor, supra, 180 Cal. App.3d at p. 632.) We, therefore, conclude in accord with the decision in Wall that it was error to exclude otherwise admissible evidence that Naomi had on two previous occasions falsely accused others of rape.
(3) Evidence Code section 354 provides inter alia that an erroneous exclusion of evidence shall not cause a judgment to be reversed unless the error complained of resulted in a miscarriage of justice and it appears of record that: "(a) The substance, purpose, and relevance of the excluded evidence was made known to the court by the question asked, an offer of proof, or by any other means; [¶] (b) The rulings of the court made compliance with subdivision (a) futile; or [¶] (c) The evidence was sought by questions asked during cross-examination or recross-examination."
The record relating to this important evidentiary question is sparse, consisting only of defense counsel's questions to the witness Tamara on direct examination and the settled statement on appeal revealing defense counsel's statement that she intended to introduce evidence of two instances in which Naomi falsely accused other men of raping her. We are satisfied, however, as meager as the record is, that the purpose and relevance of the excluded evidence was made known to the court. Whether the substance of the excluded evidence was made known to the court is problematical as the record is silent on what evidence was available to the defense. We have no basis for assuming, as the People would have us do, that the defense evidence was limited to Tamara's testimony. Indeed, that testimony may have been offered solely to establish that an accusation of rape had been made and not to reach the element of its truth or falsity.
As revealed by the settled statement the trial court, in its reliance on Evidence Code section 787, precluded the introduction of "any evidence of *19 specific acts of misconduct by Naomi ... to impeach her." Under circumstances where any evidence offered is to be excluded it would make little sense to require a showing by the defense as to the substance of the evidence it intended to introduce. In short, the ruling of the court made compliance with Evidence Code section 354, subdivision (a), futile.
(4) We turn now to the question of whether the exclusion resulted in a miscarriage of justice. We conclude that it did and that the judgment must therefore be reversed. Appellant and the victim agreed they rode the same bus and met on the sidewalk after they left at the same stop. Both admit the sexual acts took place. Both admit that afterwards they walked toward the victim's home and that the victim gave appellant her correct name and telephone number. The victim testified appellant choked her, slammed her to the ground and forced her into the sexual acts. Appellant testified he did not assault her but rather offered her drugs in exchange for sex. There were no eyewitnesses to the acts involved. The sole issue before the jury was the credibility of Naomi and appellant. The excluded testimony could have bolstered appellant's credibility on the issue of consent to such an extent that the jury would have entertained a reasonable doubt concerning the guilt of appellant. We conclude that where, as here, the resolution of appellant's guilt or innocence turned on his credibility vis-a-vis that of the victim, it is reasonably probable that the verdict would have been in appellant's favor had the excluded evidence been admitted. (People v. Wagner (1975) 13 Cal.3d 612, 621 [119 Cal. Rptr. 457, 532 P.2d 105].)

II[*]
.... .... .... .... .... .
The judgment is reversed.
Rouse, Acting P.J., and Smith, J., concurred.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.
[1] All statutory references will be to the Penal Code unless otherwise stated.
[2] Evidence Code section 787 provides: "Subject to Section 788, [concerning prior felony convictions] evidence of specific instances of his conduct relevant only as tending to prove a trait of his character is inadmissible to attack or support the credibility of a witness."
[3] Evidence Code section 1103 provides in pertinent part: "(a) In a criminal action, evidence of the character or trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if such evidence is: [¶] (1) Offered by the defendant to prove conduct of the victim in conformity with such character or trait of character."
[4] Article I, section 28, subdivision (d), of the California Constitution provides as follows: "Right to Truth-in-Evidence. Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court. Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code, Sections 352, 782 or 1103. Nothing in this section shall affect any existing statutory or constitutional right of the press."
[*] See footnote, ante, page 10.