[No. B053156. Second Dist., Div. Seven. May 14, 1991.]

JAMES CURRIE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

[No. B053232. Second Dist., Div. Seven. May 14, 1991.]

EUGENE FINLEY, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

## Counsel

Wilbur F. Littlefield, Public Defender, Laurence M. Sarnoff, Carole Telfer and John Hamilton Scott, Deputy Public Defenders, Dennis A. Fischer, Alan S. Yockelson and Andrew M. Stein for Petitioners.

No appearance for Respondent.

Ira Reiner, District Attorney, Donald J. Kaplan and Eugene D. Tavris, Deputy District Attorneys, for Real Party in Interest.

## OPINION

**WOODS (Fred), J.**—In these consolidated original proceedings petitioners James Currie (Currie) and Eugene Finley (Finley) seek a writ mandating respondent superior court to dismiss the informations pending against them. The sought for relief is based upon the prosecutor's failure to inform petitioners until *after* their preliminary hearings that the *victim* of all the charges alleged against them was himself currently charged with filing a false report, a misdemeanor (Pen. Code,[1] § 148.5). We deny the writs.

### PROCEDURAL BACKGROUND

Petitioners, in separate informations consolidated for trial, are charged with conspiracy to commit murder (§ 182, subd. (a)(1)), robbery (§ 211), felony assault (§ 245, subd. (a)(1)), and burglary (§ 459). All the crimes are alleged to have occurred on June 30, 1989. The alleged victim is Bart Francis Sullivan (Sullivan). Petitioner Currie is additionally charged with dissuading a witness (§ 136.1, subd. (c)(1)) and solicitation of murder (§ 653f, subd. (b)). The victim of these crimes, allegedly committed November 16, 1989, is also Sullivan.

The procedural history is tortuous. On August 1, 1989, the district attorney filed a felony complaint against Currie charging him only with robbery. Following a November 9 preliminary hearing, he was held to answer on that charge. An amended information adding violations of sections 459, 236, and 245 was filed December 11. But all charges were dismissed on January 12, 1990, when Currie's section 995 motion was granted.

A second felony complaint was filed January 26, 1990, and Currie, on March 15, 1990, was again held to answer. He was arraigned in superior court on March 29, 1990, and pleaded not guilty.

Finley was separately charged with the four felony offenses and on February 8, 1990, was held to answer on them all. On February 22, 1990, he was arraigned in superior court and pleaded not guilty.

In May 1990, both petitioners were informed by the district attorney that Sullivan, the alleged victim of the charges against them, had been charged with falsely reporting a crime, a misdemeanor (§ 148.5). The crime was allegedly committed by Sullivan on June 9, 1989, with a crime report taken August 15, 1989, and the misdemeanor complaint filed August 25, 1989.

[1]Unless otherwise noted all statutory references are to the Penal Code.

On May 22, 1990, Finley's section 995 motion was denied. On June 4, 1990, he filed a nonstatutory motion to dismiss the information. On June 5, 1990, Currie also filed a nonstatutory motion to dismiss the information. The motions were based upon the district attorney's failure to disclose, until long after their preliminary hearings, that he had charged Sullivan with misdemeanor filing a false report (§ 148.5) and that the charge was pending. In their motions petitioners urged that the withheld information was relevant to the credibility of Sullivan and its nondisclosure violated their right to · confrontation and cross-examination.

The district attorney, real party in interest (RPI), opposed the motions.

A hearing on the motions began July 2, 1990, before Superior Court Judge C. Robert Simpson. Sullivan testified. The hearing was continued to July 3, 1990, but did not then resume. Instead the parties were directed to file additional points and authorities and the matter was continued to July 20, 1990. On that date the court took the matter under submission. On July 25, 1990, the court issued an eight-page "Ruling and Order On Non-Statutory Motions To Dismiss The Information."

The ruling and order found that the district attorney had a duty, without a request, to disclose to petitioners information concerning the misdemeanor prosecution of Sullivan; that the district attorney had breached that duty; that as a consequence petitioners' right to cross-examine Sullivan at their preliminary hearings had been impaired; that the good faith of the district attorney was not relevant to the district attorney's duty nor to the remedy for its breach; and that petitioners "were denied a substantial right at their respective preliminary hearings."

The court then purported to "grant" the motions but instead of providing the sought for relief, dismissal of the informations, instead fashioned its own remedy. Citing *Stanton* v. *Superior Court* (1987) 193 Cal.App.3d 265 [239 Cal.Rptr. 328] as authority, and using section 995a, subdivision (b)[2] as a

---

[2]The subdivision provides: "(b)(1) Without setting aside the information, the court may, upon motion of the prosecuting attorney, order further proceedings to correct errors alleged by the defendant if the court finds that such errors are minor errors of omission, ambiguity, or technical defect which can be expeditiously cured or corrected without a rehearing of a substantial portion of the evidence. The court may remand the cause to the committing magistrate for further proceedings, or if the parties and the court agree, the court may itself sit as a magistrate and conduct further proceedings. When remanding the cause to the committing magistrate, the court shall state in its remand order which minor errors it finds could be expeditiously cured or corrected.

"(2) Any further proceedings conducted pursuant to this subdivision may include the taking of testimony and shall be deemed to be a part of the preliminary examination.

"(3) The procedure specified in this subdivision may be utilized only once for each information filed. Any further proceedings conducted pursuant to this subdivision shall not be

guide, the court remanded the cases to the Downey Municipal Court Presiding Judge. That judge was ordered to vacate the holding to answer orders, "open the proceeding for testimony and other evidence concerning any and all aspects of *People* v. *Sullivan*, case number 89M07932, filed in the Downey Municipal Court on August 25, 1989," and if either petitioner "is held to answer, to return the case to the Superior Court . . . not later than August 6, 1990."

On July 27, 1990, the parties appeared before Downey Municipal Court Presiding Judge Robert G. Drees. He noted that the magistrate who had held Currie to answer, Judge Cumming, was on vacation and would be unavailable for at least two weeks. He transferred the matters to Judge Donald L. Wilson. After still other transfers the Currie matter came before Municipal Court Judge Reynaldo Chaparro. On August 2, 1990, he ruled the municipal court lacked jurisdiction to implement the superior court order and remanded the Currie case back to the superior court. On August 3, 1990, Municipal Court Judge Donald L. Wilson similarly ruled he was without jurisdiction to proceed in the Finley matter and referred it to the superior court.

On August 6, 1990, Superior Court Judge Simpson stated "that the magistrates below were in error . . . concluding that they had no jurisdiction to carry out my order." Further, "that the defendants [petitioners] have waived their right to further cross-examine Mr. Sullivan in the courts below by virtue of their jurisdictional arguments, and this court will therefore deem such waiver as being by operation of law a withdrawal of . . . their motions before this court."

The court then reset the matters for trial.

## DISCUSSION

### I. *Was the superior court remand order valid?*

■ The district attorney, RPI, argues the superior court remand order was valid for either of two alternative reasons. First, because petitioners' motions, expressly *not* pursuant to section 995, *could* have been brought pursuant to section 995,[3] and if they had been, then section 995a, subdivision (b)(1), see fn. 2, authorized the "minor error[ ] of omission" remand.

---

deemed to extend the time within which a defendant must be brought to trial under Section 1382."

[3] The argument is phrased this way: "Granting that the material by reference to which Mr. Sullivan might assumedly have been impeached at the preliminary examinations did not appear of record therein, and thus granting that a '995 motion' would not *traditionally* lie in

The first part of the argument (that a *non*-section 995 motion may be considered a section *995* motion) finds some support in *People* v. *Aguirre* (1987) 193 Cal.App.3d 1168 [238 Cal.Rptr. 750]. The Court of Appeal stated "[t]he fact that defense counsel incorrectly labeled his request for dismissal a '995 motion' did not leave the court without authority to grant relief." (*Id.* at p. 1171, fn. 1.) *Aguirre* then considered the merits of the "*non*-995 motion."

But, assuming that petitioners' *non*-section 995 motions may be considered section *995* motions,[4] *Aguirre* is an obstacle to the second part of the argument. *Aguirre* clearly implies that a preliminary hearing error not reflected in the preliminary hearing transcript is outside the scope of a section 995 motion. (193 Cal.App.3d at p. 1171, fn. 1.) It was solely for that reason that the *Aguirre* section 995 motion, based upon belatedly provided prison reports, was "incorrect."

Although section 995[5] does not expressly confine its scope to errors present in the preliminary hearing record, it has, with one exception, been uniformly so construed. (*People* v. *Crudgington* (1979) 88 Cal.App.3d 295, 299 [151 Cal.Rptr. 737] ["The purpose of a motion to set aside the accusatory pleading under Penal Code section 995 is to review the sufficiency of the indictment or information on the basis of the record made before the grand jury in the one case or the magistrate at the preliminary hearing in the other. A section 995 motion does not contemplate the introduction of evidence at the hearing on the motion."]; *Stanton* v. *Superior Court* (1987) 193 Cal.App.3d 265, 269 [239 Cal.Rptr. 328].) The exception, *People* v. *Mackey* (1985) 176 Cal.App.3d 177 [221 Cal.Rptr. 405] has been justifiably characterized as "aberrational." (*Stanton* v. *Superior Court, supra*, 193 Cal.App.3d 265, 270.)

---

respect thereof, yet the existence of such *impeaching material* was *conclusively established, by way of factual concession by the People, in the Superior Court.* This being so, it is uncontrovertible that *such impeaching material must of necessity be deemed to have been a part of the record of the relevant preliminary examinations.* Accordingly, the People thus submit that a '995 motion' would here lie in respect thereof." (Original italics.)

[4]As noted *infra*, Finley had made a section 995 motion which was denied on May 22, 1990.

[5]The section provides: "(a) Subject to subdivision (b) of Section 995a, the indictment or information shall be set aside by the court in which the defendant is arraigned, upon his or her motion, in either of the following cases:

"(1) If it is an indictment:

"(A) Where it is not found, endorsed, and presented as prescribed in this code.

"(B) That the defendant has been indicted without reasonable or probable cause.

"(2) If it is an information:

"(A) That before the filing thereof the defendant had not been legally committed by a magistrate.

"(B) That the defendant had been committed without reasonable or probable cause.

"(b) In cases in which the procedure set out in subdivision (b) of Section 995a is utilized, the court shall reserve a final ruling on the motion until those procedures have been completed."

We conclude that because petitioners' motions to dismiss were based upon matters outside the preliminary hearing record, the motions could *not* have been brought pursuant to section 995.

We need not consider, therefore, whether failure to timely provide disclosure was a "minor error[ ] of omission" within the meaning of section 995a, subdivision (b)(1). (Compare *Tharp* v. *Superior Court* (1984) 154 Cal.App.3d 215 [201 Cal.Rptr. 131], *Loverde* v. *Superior Court* (1984) 162 Cal.App.3d 102 [208 Cal.Rptr. 134], *Hallissy* v. *Superior Court* (1988) 200 Cal.App.3d 1038 [248 Cal.Rptr. 635] with *Caple* v. *Superior Court* (1987) 195 Cal.App.3d 594 [241 Cal.Rptr. 735].)

The district attorney's alternative reason is this: in order to justly determine petitioners' nonstatutory motions the superior court properly invoked its *nonstatutory* remand authority. In support of his proposition, i.e., that the superior court *has* such remand authority, the district attorney cites only *Stanton* v. *Superior Court, supra*, 193 Cal.App.3d 265, 272.

*Stanton* does not provide such support. As in the instant matters, the defendant there claimed she was denied a substantial preliminary hearing right by district attorney nondisclosure. Based upon this denial she made both a section 995 motion and a nonstatutory motion to dismiss. The trial court denied both. The Court of Appeal found the section 995 motion properly denied but the nonstatutory motion improperly denied.

Although the Court of Appeal concluded that the defendant had been deprived of a substantial right, which if cognizable under section 995 would have required dismissal,[6] no dismissal was here required. By way of explanation the court only stated, "However, the *nonstatutory* motion to dismiss is an entirely different animal. Dismissal of the information, as conceded by defense counsel at argument, is not compelled." (*Ibid.*) The Court of Appeal did *not* then order a remand to the preliminary hearing magistrate nor suggest the superior court had such remand authority. Instead the Court of Appeal ordered the trial court to strike an allegation from the information.

*Burnett* v. *Superior Court* (1974) 12 Cal.3d 865 [117 Cal.Rptr. 556, 528 P.2d 372] also suggests the absence of such remand authority. The trial court, in *Burnett*, instead of ruling upon the defendant's section 995 motion remanded the matter to the preliminary hearing magistrate for further evidence. *Burnett* found the remand order improper. It held that only if the

---

[6]To the extent *Stanton* implies that *any* cross-examination infringement, whether by "[n]ondisclosure of evidence impeaching eyewitnesses on material issues . . ." (*Stanton* v. *Superior Court, supra*, 193 Cal.App.3d at p. 272) or otherwise, constitutes deprivation of a substantial right, we disagree. See discussion, *post.*

superior court *grants* a section 995 motion may it resubmit the matter to the preliminary hearing magistrate and then only to correct a procedural irregularity or clerical inadvertence. (*Id.* at pp. 871-873.) A defect judicial in nature may not be so cured. (*Ibid.* See also *People* v. *Norman* (1923) 62 Cal.App. 219 [216 P. 402].)

That in almost 120 years of preliminary hearings no appellate decision authorizes a testimonial remand to the magistrate, except as authorized by statute, is strong evidence there is no such authority.

We conclude that in ruling upon petitioners' nonstatutory motions to dismiss the informations, the superior court had no authority to remand the proceedings to the magistrate for additional preliminary hearing testimony. The superior court remand order was invalid.

II. *Did petitioners waive their right to relief by challenging the remand order?*

█ The district attorney argues that by challenging the remand order and the magistrate's authority to implement it, petitioners "(in effect) withdrew their motions for relief." This argument presupposes the validity of the remand order, a presupposition we have rejected. Moreover, a party may challenge the jurisdiction of a court, successfully or unsuccessfully, without thereby incurring the risk of waiving some other right.

Petitioners did not waive their right to relief by challenging the remand order.

III. *Did the superior court err in not granting petitioners' nonstatutory motions to dismiss?*

We have determined that the superior court erred in certain of its actions (e.g., remanding the proceedings to the municipal court) and in its reasons for those actions. What we have not yet determined is whether it erred in *not* doing what petitioners requested it to do: grant their dismissal motions.

That the superior court refused to grant the dismissal motions for an erroneous reason (viz., petitioners waived their right of cross-examination by challenging the court's jurisdiction) does not mean petitioners are entitled to the relief they seek. █ We review judicial action (or inaction), not judicial reasoning. (*Davis* v. *Municipal Court* (1988) 46 Cal.3d 64, 72, fn. 3 [249 Cal.Rptr. 300, 757 P.2d 11]; *People* v. *Evans* (1967) 249 Cal.App.2d 254, 257 [57 Cal.Rptr. 276]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 259, p. 266.)

Whether or not petitioners' dismissal motions should have been granted turns on the information not disclosed by the district attorney: its relevance, admissibility, and likely effect.

To properly assess this undisclosed information we must first summarize the preliminary hearing testimony.[7]

A.  *Preliminary hearing testimony*

Sullivan testified he is a medical doctor and has practiced for over 10 years. He had known Currie for about six years. They first met when he responded to Currie's newspaper advertisement for real estate investors. Sullivan invested money with Currie who was to buy and sell properties for him. Instead, Currie collected rent and allowed the properties to fall into foreclosure. Sullivan filed a $5,000 lawsuit against Currie, didn't serve him, but was in arbitration with Currie.

Sullivan had known Finley for three years. Finley did odd jobs for Currie.

On June 30, 1989, around 10 p.m., Sullivan was alone in his LaMirada home when he heard a loud crash at his kitchen door. He ran toward his bedroom but was grabbed from behind. He broke free and tried to close and bolt the bedroom door but couldn't. Two men forced their way into the bedroom.

Currie was one of the men. He carried a small baseball bat and was wearing dark clothes. Nothing covered his face.

Finley was the other man. Initially he wore a stocking mask but later removed it. He also wore dark clothing.

Currie struck him with the bat several times. He was knocked down and struck on the head. Currie and Finley handcuffed him; his hands were in front of his body. They also wrapped duct tape around his face covering his eyes. When they momentarily left the bedroom he pulled the tape partly down from his eyes and started toward a dresser drawer where he kept a gun. But Currie returned, got the gun, and struck him across the face with it.

Currie said he was going to kill Sullivan and dump his body in a field.

---

[7]Petitioners had separate preliminary hearings. Sullivan testified at both and was the sole witness at Finley's hearing. There is no claim of inconsistent testimony by Sullivan. We summarize the Currie testimony.

When Currie and Finley were again out of the bedroom he got up and locked the bedroom door. He screamed for help. When he thought they had left he climbed out the bedroom window and went to a neighbor's house for help. The police were called.

The episode had lasted about 30 minutes. Stolen were Sullivan's handgun, $7,000 in cash, and several handfuls of coins—quarters, dimes, and nickels. Sullivan's telephone wires had been cut. Sullivan was bleeding and there was blood all over his bedroom. Sullivan was treated for his injuries and a medical record drawing was made of his scalp laceration.

Some months later Currie telephoned Sullivan and said he needed a photograph of him because he was going to hire a hit man to kill him. A few weeks later, while Sullivan was sitting in court waiting to testify at Currie's preliminary hearing, Currie took two photographs of Sullivan. Sullivan complained to court personnel and to the bailiff.

Crystal Joan Scherer testified that on the evening of June 30, 1989, she was walking with a girlfriend on Burgess, a street near the Sullivan residence, when she saw a man running to a car. He was wearing all black. Another man was standing by the driver's side of the car and he said "Come on. Hurry up." The running man had his arms crossed and while he was running "a bunch of loose change dropped on the sidewalk." It was a handful or two. She and her girlfriend picked up the coins and later gave them to a police officer.

Ms. Scherer further testified that around the corner she saw a guy in handcuffs who "just yelled he was robbed." The guy "was pretty shaken up."

Robert Louis Rowe testified that in July-August 1989 he entered into an agreement to buy a house from Currie in San Bernardino. Currie never filled out any paperwork. In November 1989, Currie came to the house and demanded rent. An argument ensued. Currie calmed down when Rowe's cousin threatened him, saying "I'm already wanted for murder. Two doesn't make any more difference than one." Currie asked about Rowe's criminal record and Rowe said he had been arrested for armed robbery and murder and had done seven years in San Luis Obispo. Currie then asked Rowe to kill "Doc." Currie said it would solve a lot of his problems. Currie said he'd pay $5,000. Rowe said he'd need a photograph of "Doc." Currie said the place to get hold of "Doc" was at the courthouse. Currie referred to "Doc" as "Sullivan." In January 1990, after receiving an eviction notice from Currie, Rowe reported the murder solicitation to the authorities.

The defense[8] called one witness, district attorney investigator James Clark. He testified that during an hour and fifteen minute interview of Rowe there was no mention of a gun.

B.  *The undisclosed information: the Sullivan crime reports*

The undisclosed information—actually, *belatedly* disclosed—consists of a five-page Los Angeles County Sheriff's Department complaint report dated August 15, 1989, a two-page supplementary report dated August 23, 1989, and a misdemeanor complaint filed August 25, 1989, charging Sullivan with a violation of section 148.5, knowingly filing a false felony report.

According to the reports, on June 9, 1989, at 1:20 p.m., a man who identified himself as Mr. Ledesna, living at 14356 Cookbank Street, LaMirada (Sullivan's residence) telephoned the Norwalk Sheriff's station "regarding a possible burglary." The caller related—the five-page complaint report does not *quote* the caller—that two described men "arrived in a silver veh[icle] and parked across the street. After a while they got out entered his rear yard, and looked into windows."

Sheriff's officers responded to the caller's residence, saw the described persons and their car, and effected a "controlled felony stop." After being placed on the ground, handcuffed, and patted down, the men identified themselves as California Department of Fair Employment and Housing investigators. They had been trying to serve a civil subpoena upon Sullivan since 10 a.m. that morning. The investigators stated they had not entered Sullivan's rear yard but one of them had gone to a side fence to look into the house.

The sheriff's officers and state investigators entered the Sullivan house through the ajar kitchen door. The man they saw in the bedroom initially denied he was Sullivan and denied that he had made the phone call. When confronted with his driver's license, which the officers removed from a wallet on a nearby dresser, he acknowledged being Sullivan.

On August 4, 1989, the state investigators listened to the taped June 9 "possible burglary" call and identified Sullivan as the caller. The supplementary report, which describes this voice identification, does not contain a transcript of the telephone call. Its closest reference to the caller's words is the following: "The male [caller] advised, 'A male Mexican and Black were attempting to break into *his* house.'" (Italics added.)

---

[8]At Finley's preliminary hearing no defense witnesses were called.

## C. *The prosecutor's duty to disclose the reports*

■ "[T]he prosecution, even in the absence of a request therefor, [has a duty] to disclose all substantial material evidence *favorable to an accused*, whether such evidence relates directly to the question of guilt, to matters relevant to punishment, or to the credibility of a material witness." (*People* v. *Ruthford* (1975) 14 Cal.3d 399, 406 [121 Cal.Rptr. 261, 534 P.2d 1341].) (Original italics.)

■ Clearly, the reports were "favorable to an accused" and pertinent to "the credibility of a material witness," Sullivan. The district attorney conceded below, and does not question here, he had a duty to provide these reports to petitioners.

## D. *Do the reports contain admissible evidence?*

That the reports were favorable to petitioners because they contained information potentially adverse to Sullivan's credibility does not necessarily mean they contained, or might reasonably lead to, admissible evidence. If they did not contain admissible evidence and if there was no reasonable likelihood they would lead to admissible evidence, then petitioners suffered no preliminary hearing prejudice and their petitions should be denied.

]Liberally construed, the reports indicate that Sullivan told the sheriff's department that two men were attempting to "break into his house," i.e., commit a burglary, when Sullivan knew they were only looking into his windows, not to commit a burglary but only to serve him with a civil subpoena. So construed, the reports indicate Sullivan committed a misdemeanor (§ 148.5) and told a falsehood. That's all they indicate. They do not indicate that Sullivan had been *convicted* of a crime, felony or misdemeanor. They do not indicate any connection between the false report episode and either petitioner. And thus they do not indicate "[t]he existence or nonexistence of a bias, interest, or other motive." (Evid. Code, § 780, subd. (f).)

Among the hurdles to admitting evidence that a witness committed a misdemeanor and told a falsehood (unrelated to his/her testimony in chief) are Evidence Code sections 1101, 786, 787, 788 and 352.

Evidence Code section 1101[9] prohibits evidence "that a person committed a crime, civil wrong, or other act" if relevant only to prove a "disposition to commit such an act."

---

[9]The section provides:

"(a) Except as provided in this section and in Sections 1102 and 1103, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.

Evidence Code sections 786,[10] 787,[11] and 788[12] prohibit evidence of specific instances of conduct, except a felony conviction, to attack witness credibility. (*People* v. *Martin* (1983) 150 Cal.App.3d 148, 160 [197 Cal.Rptr. 655].)

■ However, the "Right to Truth In Evidence" provision of Proposition 8 (Cal. Const., art. I, § 28, subd.(d)) "effected a pro tanto repeal of Evidence Code section 790 and . . . sections 786 and 787." (*People* v. *Harris* (1989) 47 Cal.3d 1047, 1081 [255 Cal.Rptr. 352, 767 P.2d 619]; see also *People* v. *Adams* (1988) 198 Cal.App.3d 10, 17-18 [243 Cal.Rptr. 580].) Evidence Code section 352 was expressly retained and not repealed by Proposition 8. It provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

■ Had petitioners sought to ask Sullivan if on June 9, 1989, he had made a false burglary report, the magistrate would have had to exercise his Evidence Code section 352 discretion. A "yes" answer to the question would not have "necessitate[d] undue consumption of time." But a "no" answer would almost certainly have precipitated the calling of the two state investigators, the deputy sheriff who received the June 9 "possible burglary" telephone call, a Sullivan neighbor who saw him and the state investigators on June 9, and perhaps a witness to authenticate the telephone call tape recording. Still other witnesses might also have been called.[13] Faced with such a prospect the magistrate may well, and properly so, have exercised his discretion to exclude the question. (See *People* v. *Bittaker* (1989) 48 Cal.3d

---

"(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act.

"(c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

[10]The section provides: "Evidence of traits of his character other than honesty or veracity, or their opposites, is inadmissible to attack or support the credibility of a witness."

[11]The section provides: "Subject to Section 788, evidence of specific instances of his conduct relevant only as tending to prove a trait of his character is inadmissible to attack or support the credibility of a witness."

[12]In pertinent part, the section provides: "For the purpose of attacking the credibility of a witness, it may be shown by the examination of the witness or by the record of the judgment that he has been convicted of a felony . . . ."

[13]E.g., expert witnesses to decipher any indistinct or garbled words, or to make or dispute a voice identification.

1046, 1097 [259 Cal.Rptr. 630, 774 P.2d 659]; *People* v. *Dyer* (1988) 45 Cal.3d 26, 48 [246 Cal.Rptr. 209, 753 P.2d 1].) But, given the wide discretion afforded by section 352 (*Mozzetti* v. *City of Brisbane* (1977) 67 Cal.App.3d 565, 578 [136 Cal.Rptr. 751]), the magistrate may well have permitted the question. Given this uncertainty, the district attorney, whose nondisclosure created it, should bear its burden, and petitioners, who did not create it, should receive its benefit. Accordingly, we assume the magistrate would have permitted the question and that Sullivan would have admitted making the false report.

### E. Were petitioners denied a substantial right?

■ " '[W]here it appears that, during the course of the preliminary examination, *the defendant has been denied a substantial right*, the commitment is unlawful within the meaning of section 995, and it must be set aside upon timely motion.' " (*Jennings* v. *Superior Court* (1967) 66 Cal.2d 867, 874 [59 Cal.Rptr. 440, 428 P.2d 304].) (Original italics.)

The denial of certain rights is inherently substantial. *Jennings* provides examples: denial of counsel, failure of the magistrate to advise a defendant of his right to counsel, denial of a reasonable continuance to obtain counsel, granting an unsupported prosecution continuance motion (thereby violating § 861), and allowing, over defendant's objection, an unauthorized person to remain during the hearing (thereby violating § 868). (66 Cal.2d at pp. 874-875.) Distinctive of these rights, as *Jennings* notes, is that none deal with "the admissibility of evidence." (*Id.* at p. 875.)

As to other rights which are affected by "erroneous rulings of the magistrate on the admissibility of evidence . . . a more selective test is applied . . . ." (66 Cal.2d at p. 875.) Confrontation and cross-examination are such rights.

*Jennings* does not formulate this "more selective test." It does illustrate it by contrasting *Priestly* v. *Superior Court* with *Mitchell* v. *Superior Court*. In *Priestly* v. *Superior Court* (1958) 50 Cal.2d 812 [330 P.2d 39], the defendant was prevented from cross-examining an arresting officer concerning the identity of informants whose information provided probable cause for his warrantless arrest and search. The prosecution's entire case depended upon the informant communications. *Priestly* held "it is essential to a fair trial that the defendant have the right to cross-examine as to the source of those communications." (*Id.* at pp. 818-819.) The defendant in *Priestly* was denied a substantial right.

In *Mitchell* v. *Superior Court* (1958) 50 Cal.2d 827 [330 P.2d 48] the defendant's right of cross-examination was similarly curtailed, but "the

incriminating evidence was only partially the product of communications from confidential informants, and the defendants did not contend there was no competent evidence of reasonable cause." (*Jennings* v. *Superior Court, supra,* 66 Cal.2d at p. 878.) *Mitchell* found, and *Jennings* approved, "there was not such an interference with the right of cross-examination in this case as to justify a writ of prohibition." (*Mitchell* v. *Superior Court, supra,* 50 Cal.2d at pp. 829-830.)

Also approvingly cited by *Jennings,* as an example of cross-examination infringement not amounting to denial of a substantial right, is *People* v. *Wilson* (1960) 183 Cal.App.2d 149 [6 Cal.Rptr. 872]. The defendant was a bartender charged with felony assault. He had used a pool cue to break up a customer brawl. At his preliminary examination, on cross-examination, he attempted to ask one of the customer-victims whether a few months earlier he (the customer-victim) had thrown glasses at the same back bar, whether the defendant (bartender) had caused him to be arrested, and whether he had pleaded guilty and been fined. Although the defendant bartender argued the question "was proper impeachment because it would test the credibility of the witness and show bias" (*id.* at p. 151), the magistrate sustained the objection. Based upon this cross-examination infringement, the superior court granted defendant's section 995 motion. On appeal, the order granting the section 995 motion was reversed.

*Wilson* holds that although the magistrate erred in "limiting [defendant's] cross-examination of the prosecution's chief witness" (183 Cal.App.2d at p. 152), the error, was not prejudicial. The error only went "to the weight of the direct evidence" (*id.* at p. 153), not its sufficiency.

Later cases have similarly applied *Jennings,* finding a cross-examination interference, either at trial or preliminary examination, but *not* a denial of a substantial right (*People* v. *Benjamin* (1975) 52 Cal.App.3d 63 [124 Cal.Rptr. 799] [at trial, defendant prevented from eliciting home addresses from four critical witnesses]; *People* v. *Castro* (1979) 99 Cal.App.3d 191 [160 Cal.Rptr. 156] [at trial, defendant prevented from eliciting home address of informant-witness]; *People* v. *Gallo* (1981) 127 Cal.App.3d 828 [179 Cal.Rptr. 662] [preliminary examination: informant not required to give his address and after invoking privilege regarding heroin use, stealing, and pending burglary]; *People* v. *Watson* (1983) 146 Cal.App.3d 12 [193 Cal.Rptr. 849] [preliminary examination: informant not required to give his address]; *People* v. *Aguirre* (1987) 193 Cal.App.3d 1168 [238 Cal.Rptr. 750] [preliminary examination: nondisclosure of law enforcement reports]; *Stanton* v. *Superior Court* (1987) 193 Cal.App.3d 265 [239 Cal.Rptr. 328]

[preliminary examination: nondisclosure of reports; prejudice only affected "gross negligence" allegation of vehicle manslaughter charge].)

As *Jennings* states: "The lesson of these cases . . . is clear. As summarized by Justice Carter in his concurring opinion in *Priestly* . . . 'Not [in] every instance in which a cross-examiner's question is disallowed will defendant's right to a fair hearing be abridged, since the matter may be too unimportant [citation], or there may be no prejudice [citation], or the question may involve issues which can be brought up at a more appropriate time [citation].' " (*Jennings v. Superior Court, supra*, 66 Cal.2d 867, 879.)

██ We are satisfied that Justice Carter's words apply here. Although RPI's withholding of the reports prevented petitioners from cross-examining Sullivan about committing, and being charged with committing, the making of a false report (§ 148.5), petitioners were not denied a fair hearing.

Had petitioners been furnished the reports and thus been able to cross-examine Sullivan, the impeachment, if any, would have been collateral. The false report was extraneous to petitioners, and provided no evidence of adverse bias, interest, or motive.

Moreover, reasonable cause evidence was overwhelming. Mistaken identification was out of the question: Sullivan knew both petitioners, Currie for six years, Finley for three years; he had ample time to observe them both since the episode lasted 30 minutes, occurred in his illuminated bedroom, and Currie wore no mask and Finley removed his mask. Proof the crimes had been committed consisted of Sullivan's detailed, direct evidence and such corroborating circumstantial evidence (either testified to or not contested) as: blood in Sullivan's bedroom; the blood, bruises, and lacerations on Sullivan; handcuffs on Sullivan; duct tape on Sullivan; cut telephone wires; a nearby fleeing man dressed in black dropping handfuls of coins; another man standing by a car telling him to "Hurry up"; Currie's solicitation of Rowe to murder Sullivan; and Currie photographing Sullivan.

We conclude petitioners were not denied a substantial right[14] (*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d

---

[14]Although some evidence against Currie was not presented against Finley, Currie elicited bias evidence and Finley did not. Petitioners also claimed prejudice by hypothesizing that Sullivan might have asserted a self-incrimination privilege if asked about the false report. That hypothesis does not alter our analysis or conclusion. (See *People v. Gallo, supra*, 127 Cal.App.3d 828, 837-838; *People v. Daggett* (1990) 225 Cal.App.3d 751 [275 Cal.Rptr. 287].)

1065]) and therefore the superior court did not err by not granting their nonstatutory dismissal motions.

## DISPOSITION

The petitions for a writ of mandamus or prohibition are denied.

Lillie, P. J., concurred. Johnson, J., concurred in the judgment only.

Petitioner's applications for review by the Supreme Court were denied July 24, 1991.