[No. B244661. Second Dist., Div. One. Mar. 25, 2013.]

GEORGE ELEX BRIDGEFORTH, JR., Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

Ronald L. Brown, Public Defender, Albert J. Menaster, Gregory S. Lesser and Albert Camacho, Jr., Deputy Public Defenders, for Petitioner.

No appearance for Respondent.

Steve Cooley and Jackie Lacey, District Attorneys, Beth Widmark, Patrick D. Moran and Roberta T. Schwartz, Deputy District Attorneys, for Real Party in Interest.

OPINION

**MALLANO, P. J.**—Petitioner George Elex Bridgeforth, Jr., is charged with four offenses, including attempted murder and murder, with a special circumstance allegation that the murder was committed while Bridgeforth was

engaged in the commission of a robbery. The trial court denied Bridgeforth's nonstatutory motion to dismiss the information, which was based upon the theory that the prosecutor's failure to disclose, prior to the preliminary hearing, photographs of the attempted murder victim's truck denied him the right to confront and cross-examine witnesses and the right to effective assistance of counsel. Bridgeforth sought a writ of mandate on the theory that the delay in disclosure violated due process. We conclude that the criminal discovery statutes did not bar Bridgeforth's motion, and due process requires the prosecution to disclose, prior to the preliminary hearing, evidence in its possession that is both favorable to the defense and material to the probable cause determination to be made at the preliminary hearing. Nevertheless, the photographs of the attempted murder victim's truck were not favorable to the defense. Accordingly, we deny Bridgeforth's petition for a writ of mandate.

## BACKGROUND

In a complaint filed July 13, 2011, Bridgeforth was charged with murder, attempted murder, shooting at an occupied vehicle, and possession of a firearm by a convicted felon. The complaint alleged a gang enhancement, personal use of a firearm, and robbery-murder and gang-related-murder special circumstances. On July 27, 2011, Bridgeforth was arraigned and pleaded not guilty.

1. *Preliminary hearing*

Bridgeforth's preliminary hearing was conducted on February 22, 2012. At the outset, the prosecutor announced that she would not be pursuing the gang enhancement and gang-related-murder special circumstance. The court accordingly struck those allegations. The following evidence was adduced at the preliminary hearing.

About 10:00 p.m. on May 13, 2011, Los Angeles Police Officer Ruben Gonzalez responded to a call of shots fired at a Ralphs supermarket located at the northeast corner of 120th Street and South Vermont Avenue in Los Angeles. He found Walter Jerome Shepard lying on the ground next to an older model car in the parking lot. Shepard was not breathing. Bullet casings were found in two locations: near Shepard's car on its right side and toward a brick or block wall about 20 to 30 feet east of the car.

The parties stipulated that Shepard died of multiple gunshot wounds.

Ramon Valenzuela testified that around 10:00 p.m. on May 13, 2011, he was seated in the driver's seat of his truck in the Ralphs parking lot waiting for his wife, who was shopping inside of the store. His truck was parked

facing Vermont. He saw a Black man come out of the store and go to a car that was parked two or three "stalls" to the right of and behind Valenzuela's truck. Nothing blocked Valenzuela's view of the car. The man opened the driver's door of the car, then went to the back of the car and opened the trunk. He pulled something out of the trunk, then turned to the left and fired four shots. Valenzuela could not see what the man was shooting at. The cars that were near Valenzuela's truck rapidly left the parking lot. Valenzuela opened up his mobile phone, which lit up the interior of his truck. The gunman fired a shot toward Valenzuela, ran toward a wall, and fired again toward Valenzuela. Both shots struck Valenzuela's truck. The gunman jumped a wall separating the parking lot from some houses. The man remained behind the wall, looking at Valenzuela's truck. Then the police were "in the process of arriving." Valenzuela drove up to the door of Ralphs, his wife came out, and they drove home without speaking to the police. He estimated that he had been in the parking lot for about 15 minutes before the shooting, and his wife was in the store for 20 or 25 minutes. Valenzuela called the police the next day, after he noticed a bullet hole in the back window of his truck.

At the time of the charged offenses, Bridgeforth was on parole and wearing a GPS tracking device. An employee of California's Department of Corrections and Rehabilitation testified that the data from the device Bridgeforth wore revealed that he was in the Ralphs parking lot from 8:47 to 8:53 p.m., 9:01 to 9:40 p.m., 9:50 to 9:52 p.m., and 10:01 to 10:06 p.m. At 10:07 p.m. Bridgeforth was on Ainsworth Street, which is the first street east of Ralphs. At 10:08 p.m. Bridgeforth was northbound on Vermont Avenue, and thereafter on the 105 Freeway.

Detective Lyman Doster testified that 12 nine-millimeter casings were recovered, with one group to the rear of a 1972 Chevrolet registered to Shepard and another group east of the car toward a block wall. Days later, an officer searched Shepard's car and in its trunk found four prescription bottles of cough syrup containing codeine, known on the street as "juice."

On July 11, 2011, Doster interviewed Bridgeforth after advising him of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, 444 [16 L.Ed.2d 694, 86 S.Ct. 1602], and obtaining proper waivers. Bridgeforth eventually told Doster he was present at the shooting, meeting with Shepard to purchase "juice." Shots rang out, Bridgeforth grabbed the "juice" and fled, going over the block wall. Bridgeforth then admitted he was carrying a nine-millimeter gun in case he needed it for protection or the deal went wrong. Shepard was reaching in his pockets and acting very nervously. Bridgeforth said at that point he decided to shoot Shepard. Bridgeforth said he had not paid Shepard, but he took the "juice," fled, and got into a car driven by his sister.

Bridgeforth said he saw a car driving toward him and thought it might be a friend of Shepard's, so he fired a couple of rounds at that car before jumping the wall. Bridgeforth explained he had asked his sister to drive him to the parking lot to make the deal. He told her to pick him up on Ainsworth if she heard shots. Bridgeforth also told Doster that Shepard had shortchanged him in prior "juice" purchases.

The magistrate held Bridgeforth to answer on all four counts, the robbery-murder special circumstance, and allegations of personal firearm use under Penal Code section "12022.53, subsection (b) [*sic*]" and subdivision (c). (Undesignated statutory references are to the Penal Code.)

## 2. *Bridgeforth's motions*

On July 20, 2012, Bridgeforth filed a nonstatutory motion to dismiss the entire information, not just the robbery-murder special circumstance. He argued dismissal was required because he "was denied a substantial right at the preliminary hearing, namely the right to confront and cross-examine witnesses, and the right to effective assistance of counsel."

Bridgeforth argued the prosecutor's failure to turn over photographs of Valenzuela's truck violated *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194] (*Brady*). He elaborated, "Based on all the statements provided to the defense, it was assumed victim Valenzuela was in the champagne colored suv/truck which was parked two stalls away from victim Shephard's [*sic*] vehicle. That was not the case. The defense had absolutely no way of knowing that. Had the defense been provided with the photographs, it would have been clear that victim Valenzuela was in a white truck. It would have been clear that victim Valenzuela did not show up on the scene until both [Bridgeforth] and victim Shepard were already at the trunk. It would have been clear that victim Valenzuela had an obstructed view of what was going on. [¶] The defense would have been able to use that information at the preliminary hearing and impeach victim Valenzuela and diminish his credibility and the value of his testimony. This is significant because the prosecutor relied on that testimony in arguing that [Bridgeforth] should be held to answer on all the counts and special allegations."

The motion included a declaration from defense counsel in which he stated, "The videos from each camera were provided to the defense. The quality of the video was very poor and could not be viewed. They were on a very high speed and poor quality. The defense had FDS Labs appointed to enhance the quality of the video. FDS Labs did that and the defense was able to view the video to help prepare for the preliminary hearing. The video showed a truck/suv that was a champagne color parked two stalls away from

victim Shephard's [*sic*] vehicle, which was where the shooting took place. Based on all the information the defense had, this champagne colored truck was victim Valenzuela's vehicle. [¶] . . . [¶] After the preliminary hearing, I viewed the video many times after going over the preliminary hearing transcript. The video showed that the driver of the champagne truck was not in his vehicle at the time of the shooting and as the shooter ran away. The driver was walking from the store and got in the champagne truck, after the shooter had fled, and left the area."

Counsel's declaration further explains that he spoke to the prosecutor and learned that Valenzuela was in a white truck. He continues, "I then went back to viewing the video of the incident to see where the white truck was and what happened with it." Counsel states that Bridgeforth and Shepard went to the trunk of Shepard's car at three minutes 10 seconds into the video, Shepard opened his trunk at four minutes eight seconds, Valenzuela's white truck arrived in the parking lot at five minutes 28 seconds and parked at five minutes 40 seconds, Valenzuela's wife left the truck at six minutes 40 seconds, and the shooting occurred at seven minutes 54 seconds. Bridgeforth ran toward the wall and fired more shots at eight minutes two seconds into the video, Valenzuela drove off at eight minutes 21 seconds, and the police arrived at 12 minutes 30 seconds into the video.

The prosecutor's written opposition to Bridgeforth's motion noted that she had provided the defense the video on July 27, 2011, which was the day after she received it and 210 days before the preliminary hearing.

At the hearing on the motion, defense counsel stated that "[t]here were 30 other cars probably in that parking lot," but he had no reason to believe that Valenzuela was in any of them, as opposed to the champagne-colored SUV. The court asked whether there was anyone in the champagne-colored SUV. Defense counsel replied, "At the time of the shooting there was an individual that's walking from the store area up towards the champagne colored S.U.V. or truck. The gun shot you can tell the gun shots go off. That individual turns and goes back to the store. A few seconds later that individual goes and gets in the champagne colored S.U.V. and leaves." In response to the court's inquiries, defense counsel confirmed that he never asked Valenzuela what vehicle he was in and Valenzuela had referred to his vehicle as a truck. The court denied the motion without further comment.

3. *Petition for a writ of mandate*

On October 22, 2012, Bridgeforth filed a petition for a writ of mandate in this court, asserting that the trial court had erred by denying his nonstatutory motion to dismiss the special circumstance allegation because the prosecutor

violated his constitutional rights by failing to turn over the photographs of Valenzuela's truck before the preliminary hearing. He argued, "[T]he prosecution . . . was in possession of evidence and information, i.e., the photograph of Valenzuela's vehicle, that would undermine Valenzuela's testimony, undermine Valenzuela's credibility, and would in all likelihood lead to a dismissal of the special circumstance allegation. [¶] The prosecution's failure to turn over the photograph was a suppression of substantial material evidence bearing on the credibility of a key prosecution witness. [Citation.] It is a denial of due process within the meaning of the Fourteenth Amendment."

Real party in interest the People filed preliminary opposition. On December 13, 2012, we ordered the superior court to show cause why a peremptory writ should not issue. The People filed a return, to which Bridgeforth replied.

## DISCUSSION

Bridgeforth contends that he was entitled to prepreliminary hearing production of the photographs of Valenzuela's truck pursuant to *Brady, supra,* 373 U.S. 83. The People contend that the criminal discovery statutes are "now the exclusive means by which a criminal defendant may obtain discovery from the People," and these statutes do not require disclosure before the preliminary hearing. The People further contend that enactment of the criminal discovery statutes abrogated decisions authorizing a nonstatutory motion to dismiss for a failure to disclose material favorable evidence before a preliminary hearing. The People further argue that a defendant has no due process right to discovery before a preliminary hearing. Finally, the People argue that disclosure of the photographs of Valenzuela's truck would not have altered the outcome of the preliminary hearing.

■ We conclude that a defendant has a due process right under the California Constitution and the United States Constitution to disclosure prior to the preliminary hearing of evidence that is both favorable and material, in that its disclosure creates a reasonable probability of a different outcome at the preliminary hearing. This right is independent of, and thus not impaired or affected by, the criminal discovery statutes. We nevertheless conclude that the photographs of Valenzuela's truck were not favorable to the defense, and thus the prosecutor's delay in turning them over to the defense was not a violation of due process. Accordingly, the trial court did not err by denying Bridgeforth's nonstatutory motion to dismiss, and we deny his petition for a writ of mandate.

1. *The right to prepreliminary hearing disclosure of material favorable evidence*

Proposition 115, approved on June 5, 1990, substantially revised the laws governing criminal discovery, as well as other aspects of criminal law and procedure, including some aspects of preliminary hearings. The proposition declared that "comprehensive reforms are needed in order to restore balance and fairness to our criminal justice system." (Ballot Pamp., Primary Elec. (June 5, 1990) text of Prop. 115, p. 33.) It decried *statutes and California Supreme Court decisions that had "unnecessarily expanded the rights of accused criminals far beyond that which is required by the United States Constitution, thereby unnecessarily adding to the costs of criminal cases, and diverting the judicial process from its function as a quest for truth." (Ibid.)*

■ With respect to discovery, Proposition 115 added the following provision to the state Constitution: "In order to provide for fair and speedy trials, discovery in criminal cases shall be reciprocal in nature, as prescribed by the Legislature or by the people through the initiative process." (Cal. Const., art. I, § 30, subd. (c).) Proposition 115 also added the criminal discovery statutes, commencing with section 1054, to the Penal Code. Section 1054 sets forth the purposes of the new discovery scheme: "This chapter shall be interpreted to give effect to all of the following purposes: [¶] (a) To promote the ascertainment of truth in trials by requiring timely pretrial discovery. [¶] (b) To save court time by requiring that discovery be conducted informally between and among the parties before judicial enforcement is requested. [¶] (c) To save court time in trial and avoid the necessity for frequent interruptions and postponements. [¶] (d) To protect victims and witnesses from danger, harassment, and undue delay of the proceedings. [¶] (e) To provide that no discovery shall occur in criminal cases except as provided by this chapter, other express statutory provisions, *or as mandated by the Constitution of the United States.*" (Italics added.) We note that although section 1054, subdivision (e) mentions only the United States Constitution, " 'as a mere statute, [it] has no power to preclude discovery where it is required to vindicate rights guaranteed by the California Constitution.' " (*Magallan v. Superior Court* (2011) 192 Cal.App.4th 1444, 1462 [121 Cal.Rptr.3d 841].)

Section 1054.1 requires the prosecutor to disclose the following categories of information to the defense, if the prosecutor possesses the information or knows it is possessed by investigating agencies: the names and addresses of witnesses the prosecutor intends to call, the defendant's statements, relevant real evidence seized or obtained during the course of the investigation of the charged offenses, felony convictions of material witnesses, any exculpatory evidence, and relevant written or recorded statements of witnesses or reports

of the statements of witnesses whom the prosecutor intends to call at the trial. Section 1054.7 requires that disclosure must be made at least 30 days before trial, unless good cause is shown for denying, restricting, or deferring disclosure.

Apart from this statutory obligation, it has long been held that due process requires the prosecutor to disclose to the defense any and all evidence known to the prosecution team that is both favorable to the accused and material on the issue of guilt or punishment. (*Brady, supra*, 373 U.S. at p. 87; *United States v. Bagley* (1985) 473 U.S. 667, 676 [87 L.Ed.2d 481, 105 S.Ct. 3375]; *In re Brown* (1998) 17 Cal.4th 873, 879 [72 Cal.Rptr.2d 698, 952 P.2d 715]; *People v. Jordan* (2003) 108 Cal.App.4th 349, 358 [133 Cal.Rptr.2d 434].) "In order that a defendant may secure a fair trial as required by the due process clause, 'the prosecution has a duty to disclose all substantial material evidence favorable to an accused. [Citations.] That duty exists regardless of whether there has been a request for such evidence [citation], and irrespective of whether the suppression was intentional or inadvertent.' " (*Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 378 [285 Cal.Rptr. 231, 815 P.2d 304] (*Izazaga*).) The obligation of disclosure includes both potentially exculpatory evidence and impeachment evidence regarding prosecution witnesses. (*Bagley*, at p. 676.)

Nothing in the discovery statutes alters the obligation imposed upon the prosecutor by due process. In addition to the clear language of section 1054, subdivision (e), the California Supreme Court has held, "The prosecutor's duties of disclosure under the due process clause are *wholly independent* of any statutory scheme of reciprocal discovery. The due process requirements are self-executing and need no statutory support to be effective. Such obligations exist whether or not the state has adopted a reciprocal discovery statute. Furthermore, if a statutory discovery scheme exists, these due process requirements operate outside such a scheme. The prosecutor is obligated to disclose such evidence *voluntarily*, whether or not the defendant makes a request for discovery. [¶] No statute can limit the foregoing due process rights of criminal defendants, and the new discovery chapter does not attempt to do so. On the contrary, the new discovery chapter contemplates disclosure *outside* the statutory scheme pursuant to constitutional requirements as enunciated in *Brady, supra*, 373 U.S. 83, and its progeny." (*Izazaga, supra*, 54 Cal.3d at p. 378.)

Before the passage of Proposition 115, several cases held that a prosecutor's failure " 'to disclose all substantial material evidence *favorable to an accused*' " before the preliminary hearing violated due process. (*Stanton v. Superior Court* (1987) 193 Cal.App.3d 265, 269–270 [239 Cal.Rptr. 328] (*Stanton*); see *People v. Mackey* (1985) 176 Cal.App.3d 177,

187 [221 Cal.Rptr. 405]; *Currie v. Superior Court* (1991) 230 Cal.App.3d 83, 96–100 [281 Cal.Rptr. 250].) It is unclear whether these cases were premised upon California Constitution, article I, sections 7, subdivision (a) and 15, the federal Constitution, or both. One post-Proposition 115 published decision applied *Stanton*—while summarily rejecting an argument that the case had been abrogated by Proposition 115—to conclude that the prosecutor's failure to disclose, prior to the preliminary hearing, that a witness told the police that the defendant was not one of the participants in a robbery and murder, violated due process. (*Merrill v. Superior Court* (1994) 27 Cal.App.4th 1586, 1593–1597 & fn. 5 [33 Cal.Rptr.2d 515] (*Merrill*).)

Although Proposition 115 narrowed the scope of preliminary hearings to a determination of "whether there exists probable cause to believe that the defendant has committed a felony," prohibited the use of a preliminary hearing for discovery (§ 866, subd. (b)), and made the hearsay testimony of qualified law enforcement officers admissible at preliminary hearings (Cal. Const., art. I, § 30, subd. (b); Pen. Code, § 872, subd. (b)), a defendant nonetheless retains several substantial rights at the preliminary hearing. These include a right to confront and cross-examine prosecution witnesses (§ 865); a right to the effective assistance of counsel (*Galindo v. Superior Court* (2010) 50 Cal.4th 1, 9 [112 Cal.Rptr.3d 673, 235 P.3d 1]; *People v. Cudjo* (1993) 6 Cal.4th 585, 615 [25 Cal.Rptr.2d 390, 863 P.2d 635]); a right to present evidence to "establish an affirmative defense, negate an element of a crime charged, or impeach the testimony of a prosecution witness or the statement of a declarant testified to by a prosecution witness" (§ 866, subd. (a)); and a right to due process (*Mills v. Superior Court* (1986) 42 Cal.3d 951, 959 [232 Cal.Rptr. 141, 728 P.2d 211], abrogated by Prop. 115 on another point pertaining to admission of certain hearsay as permitted by Cal. Const., art. I, § 30, subd. (b) and Pen. Code, § 872, subd. (b)). Nothing in Proposition 115, including the provisions pertaining to criminal discovery and preliminary hearings, affected a defendant's right to due process at the preliminary hearing under either or both the state and federal Constitutions. Accordingly, Proposition 115 did not limit or abrogate *Stanton* and similar cases.

In *People v. Gutierrez* (2013) 214 Cal.App.4th 343, Division Three of the Court of Appeal, First District, recently reached the same conclusion: Proposition 115 did not abrogate *Stanton* and its progeny or limit a defendant's due process right to *Brady* material at the preliminary hearing.

Apart from one Oklahoma case (*State v. Benson* (1983) 1983 OK CR 43 [661 P.2d 908, 909]), which cites only another Oklahoma case (*Stafford v. District Court of Oklahoma County* (1979) 1979 OK CR 43 [595 P.2d 797, 799]) declaring, without analysis, that there is no right to *Brady* disclosure before a preliminary examination, the People fail to cite authority for their

contention that a defendant has no due process right to discovery before a preliminary hearing. *Kyles v. Whitley* (1995) 514 U.S. 419 [131 L.Ed.2d 490, 115 S.Ct. 1555], cited by the People, involved a postconviction exposure of undisclosed exculpatory evidence and did not purport to address a requirement, or lack thereof, of disclosure prior to a preliminary hearing.

*United States v. Ruiz* (2002) 536 U.S. 622 [153 L.Ed.2d 586, 122 S.Ct. 2450] (*Ruiz*), on which the People principally rely, addressed the following question: "whether the Fifth and Sixth Amendments require federal prosecutors, before entering into a binding plea agreement with a criminal defendant, to disclose 'impeachment information relating to any informants or other witnesses.' " (*Id.* at p. 625.) In *Ruiz*, a federal prosecutor offered a defendant a standardized " 'fast track' plea bargain" under which she would, if she accepted the agreement, waive indictment, trial, appeal, and the right to receive " 'impeachment information relating to any informants or other witnesses.' " (*Ibid.*) The plea offer nonetheless stated that " 'any [known] information establishing the factual innocence of the defendant' 'has been turned over to the defendant,' and it acknowledge[d] the Government's 'continuing duty to provide such information.' " (*Ibid.*) Ruiz refused to accept the plea offer, was indicted, pleaded guilty, and then sought the same sentence she would have received pursuant to the plea offer if she had accepted it. The trial court refused her request, sentenced her to a longer term, and she appealed. (*Id.* at pp. 625–626.) The Court of Appeals for the Ninth Circuit vacated Ruiz's sentence and remanded on the ground that the plea offer's requirement of a waiver of impeachment material was invalid, as was the prosecutor's opposition to a lower sentence based upon Ruiz's refusal to waive that right. (*U.S. v. Ruiz* (9th Cir. 2001) 241 F.3d 1157, 1167–1168.)

The United States Supreme Court reversed the Ninth Circuit decision. Notably, the court did not hold that a defendant's right to receive exculpatory and impeachment material applied only to a trial, as the People suggest. The court instead considered several factors before concluding that the federal Constitution does not require "preguilty plea disclosure of impeachment information." (*Ruiz, supra,* 536 U.S. at p. 629.) First, the court noted, "impeachment information is special in relation to the *fairness of a trial,* not in respect to whether a plea is *voluntary* ('knowing,' 'intelligent,' and 'sufficient[ly] aware')." (*Ibid.*) The court further explained, "It is particularly difficult to characterize impeachment information as critical information of which the defendant must always be aware prior to pleading guilty given the random way in which such information may, or may not, help a particular defendant. The degree of help that impeachment information can provide will depend upon the defendant's own independent knowledge of the prosecution's potential case—a matter that the Constitution does not require prosecutors to disclose." (*Id.* at p. 630.) Second, the court explained, "this Court has found that the Constitution, in respect to a defendant's awareness of relevant

circumstances, does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor." (*Ibid.*)

Finally, the court utilized a traditional three-factor due process analysis: "This Court has said that due process considerations include not only (1) the nature of the private interest at stake, but also (2) the value of the additional safeguard, and (3) the adverse impact of the requirement upon the Government's interests. [Citation.] Here, as we have just pointed out, the added value of the Ninth Circuit's 'right' to a defendant is often limited, for it depends upon the defendant's independent awareness of the details of the Government's case. And in any case, as the proposed plea agreement at issue here specifies, the Government will provide 'any information establishing the factual innocence of the defendant' regardless. That fact, along with other guilty-plea safeguards, [citation], diminishes the force of Ruiz's concern that, in the absence of impeachment information, innocent individuals, accused of crimes, will plead guilty. [Citation.] [¶] At the same time, a constitutional obligation to provide impeachment information during plea bargaining, prior to entry of a guilty plea, could seriously interfere with the Government's interest in securing those guilty pleas that are factually justified, desired by defendants, and help to secure the efficient administration of justice. The Ninth Circuit's rule risks premature disclosure of Government witness information, which, the Government tells us, could 'disrupt ongoing investigations' and expose prospective witnesses to serious harm." (*Ruiz, supra,* 536 U.S. at pp. 631–632.) The court also cited the government's interests in "its 'general practice' of not 'disclos[ing] to a defendant pleading guilty information that would reveal the identities of cooperating informants, undercover investigators, or other prospective witnesses' " and the "resource-saving advantages" of "its heavy reliance upon plea bargaining in a vast number—90% or more—of federal criminal cases." (*Id.* at p. 632.) It concluded, "We cannot say that the Constitution's due process requirement demands so radical a change in the criminal justice process in order to achieve so comparatively small a constitutional benefit. [¶] These considerations, taken together, lead us to conclude that the Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." (*Id.* at pp. 632–633.)

A defendant who has pleaded not guilty and will have a preliminary hearing occupies a vastly different position than one who is considering waiving his or her constitutional rights and admitting guilt pursuant to a preindictment plea offer. " ' "[T]he purpose of a preliminary hearing is, in part, to assure that a person is not detained for a crime that was never committed . . . ." ' [Citation.] Preliminary hearings are ' "designed to weed out groundless or unsupported charges of grave offenses and to relieve the

accused of the degradation and expense of a criminal trial." ' [Citation.] Preliminary hearings . . . 'operate as a judicial check on the exercise of prosecutorial discretion' and help ensure ' "that the defendant [is] not . . . charged excessively." ' " (*People v. Plengsangtip* (2007) 148 Cal.App.4th 825, 835 [56 Cal.Rptr.3d 165].) Preliminary hearings thus serve to protect both the liberty interest of the accused and the judicial system's and society's interest in fairness and the expeditious dismissal of groundless or unsupported charges, thereby avoiding a waste of scarce public resources. Requiring prosecutorial disclosure of information that is both favorable to the defense and material to the magistrate's determination of "whether there exists probable cause to believe that the defendant has committed a felony" (§ 866, subd. (b)) provides a valuable additional safeguard for these extremely important interests. No comparable interest is served by disclosure of impeachment information to a person contemplating a plea offer. In addition, because information that is both favorable and of such importance that it can be said to be material to the outcome of a probable cause determination would cast such serious doubt upon the prosecutor's case, requiring the prosecutor to disclose such information before the preliminary hearing will have little or no adverse effect upon the People's legitimate interests. Accordingly, applying the traditional three-factor due process analysis utilized in *Ruiz, supra,* 536 U.S. at page 631, and weighing the effect of the remaining considerations cited in *Ruiz,* we conclude that the established California authorities, such as *Stanton, supra,* 193 Cal.App.3d at pages 269–270, and *Merrill, supra,* 27 Cal.App.4th at pages 1589, 1594, 1596, are fully consistent with due process under the federal Constitution, as well as California Constitution, article I, sections 7, subdivision (a) and 15.

■ We emphasize that the precise scope of a defendant's due process right to disclosure and the determination of whether that right has been violated are necessarily tailored to the context and purpose of the preliminary hearing. (*Merrill, supra,* 27 Cal.App.4th at pp. 1596–1597; *People v. Harris* (1985) 165 Cal.App.3d 1246, 1264 [212 Cal.Rptr. 216] (*Harris*).) Accordingly, the standard of materiality is whether there is a reasonable probability that disclosure of the exculpatory or impeaching evidence would have altered the magistrate's probable cause determination with respect to any charge or allegation. (*Merrill,* at pp. 1596–1597.) In addition, of course, the duty of prepreliminary hearing disclosure extends only to matters within the possession or control of the prosecution team before the conclusion of the preliminary hearing.

2. *Failure to disclose photographs of Valenzuela's truck before Bridgeforth's preliminary hearing*

The photos of Valenzuela's truck were not potentially exculpatory and provided no basis for impeachment. Valenzuela did not, for example, testify

he was driving the champagne-colored SUV. Beyond referring to his vehicle as a truck, he did not describe it and was not asked to describe it. Defense counsel, not the prosecutor or Valenzuela, was alone responsible for his own erroneous assumption that the champagne-colored SUV was Valenzuela's vehicle. Although disclosure of the photos of Valenzuela's truck would likely have disabused defense counsel of his erroneous conclusion, the photos themselves were not exculpatory or impeaching evidence. Indeed, the photos, which apparently depicted the gunshot damage to Valenzuela's truck, were arguably *inculpatory* evidence that corroborated Valenzuela's testimony that Bridgeforth shot at him as he sat in his truck. These shots were the basis of the attempted murder and discharge of a firearm at an occupied vehicle charges.

The potentially exculpatory or impeaching evidence in this case was the videotape, which the prosecutor provided to the defense seven months before the preliminary hearing and which defense counsel admittedly reviewed—in its enhanced state—before the preliminary hearing. As set forth in defense counsel's declaration, all of the potentially exculpatory or impeaching matters cited by Bridgeforth in his motion to dismiss and his writ petition are depicted on the video. Had counsel reviewed the enhanced video adequately before the preliminary hearing, he would have known, as he later admitted in the motion to dismiss, that the driver of the champagne-colored SUV was not in his vehicle at the time of the shooting or the events immediately preceding the shooting, and was, in fact, just walking out of the store when the first shots were fired. Had counsel adequately reviewed the enhanced video before the preliminary hearing, this information would either have dispelled counsel's erroneous assumption that Valenzuela was in the champagne-colored SUV or informed him that he should cross-examine Valenzuela about the obvious contradiction between the video's depiction of the absence of the driver of the champagne-colored SUV and Valenzuela's testimony he was seated in his truck while making the observations to which he testified. With an adequate review of the video and cross-examination of Valenzuela that would have led to the identification of Valenzuela's truck, defense counsel could have played the video at the preliminary hearing and demonstrated each of the matters set forth in the motion to dismiss. The prosecutor is in no sense responsible for defense counsel's failure to realize the impeaching or exculpating value of the video in time to use it at the preliminary hearing. As *Harris* noted, "Due process is not synonymous with total inaction and noninvolvement. . . . Some actions undertaken by the defense may result in benefit to the prosecution, yet due process is not violated." (*Harris, supra,* 165 Cal.App.3d at p. 1264.)

Accordingly, the delay in providing photographs of Valenzuela's truck as not a breach of the prosecutor's duty of disclosure because those photographs were not favorable to the defense or material to the probable cause determination.

### DISPOSITION

The petition for a writ of mandate is denied.

Rothschild, J., and Johnson, J., concurred.

A petition for a rehearing was denied April 10, 2013, and the petition of real party in interest for review by the Supreme Court was denied June 19, 2013, S210446. Baxter, J., was of the opinion that the petition should be granted.