Filed 2/20/14  P. v. Estrada CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RUBEN MORA ESTRADA,<br><br>    Defendant and Appellant. | H038280<br>(Santa Cruz County<br> Super. Ct. No. F20622) |

Defendant Ruben Mora Estrada was convicted by a jury of possession for sale of a controlled substance (Health & Saf. Code, § 11351)[1] and being under the influence of a controlled substance (§ 11550, subd. (a)).  He was sentenced to 36 months probation and 300 days in county jail on those charges.[2]

On appeal, Estrada contends the judgment must be reversed because the prosecutor failed to turn over evidence prior to the preliminary hearing which would have supported his motion to suppress evidence and this failure amounts to a *Brady*[3] violation.  Estrada also argues that the trial court incorrectly calculated his presentence credits, a position the People concede.

---

[1] Further unspecified statutory references are to the Health and Safety Code.

[2] At his sentencing hearing, Estrada also pleaded no contest to various charges in separate cases, the details of which are set forth below.

[3] *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

We reject Estrada's *Brady* argument, but find the People's concession regarding the credits calculation is appropriate. Accordingly, we shall modify the judgment to award Estrada the additional credit claimed and, as modified, affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Estrada was charged by information with possession of heroin for sale (§ 11351) and being under the influence of opiates and amphetamine (§ 11550, subd. (a)).

### A. *Prosecution's case*

On March 13, 2011, Santa Cruz Police Detective Daniel Forbus and a trainee officer saw Estrada riding a bicycle the wrong direction on a one-way street. The officers turned their patrol car around and activated their lights to stop the bicycle. Estrada pulled into a nearby driveway and stopped.

Forbus got out of the patrol car and asked Estrada to sit down, informing him he was being detained for a Vehicle Code violation. Forbus recognized Estrada because three to six weeks earlier, Forbus had observed Estrada riding a bicycle the wrong way on a one-way street and at that time had given him a warning. Forbus directed the trainee officer to write the citation and they obtained Estrada's I.D.

Forbus then noticed Estrada had a knife inside a sheath on his waistband and told Estrada that he wanted to secure the knife during the detention. Forbus advised Estrada that he would be taking the knife and cautioned him not to reach for it. Estrada complied and as Forbus was securing the knife, he asked if Estrada had any other weapons. Estrada said he had another knife in one of his pockets and started to reach for it. Forbus had Estrada put his hands behind his back, where he held Estrada's hands with one hand while he conducted a pat search to make sure Estrada had no other weapons on his person. Forbus found the second knife in Estrada's left front pocket, but found no other weapons. Both knives were legal.

Prior to the pat search, Forbus noticed Estrada's face had been "scratched and picked." Forbus suspected Estrada's facial appearance was the result of heroin or

2

methamphetamine use, which can cause the user's skin to itch, leading to repeated scratching. During the pat search, he observed additional signs of narcotics usage, specifically that Estrada was sweating profusely yet his hands were clammy and cold. All of these factors led Forbus to believe Estrada was possibly under the influence of a controlled substance or narcotic. Forbus asked Estrada where he was riding from and what he was doing in order to see if there was another explanation for his appearance, but nothing Estrada said accounted for these physiological symptoms.

Forbus therefore detained Estrada pursuant to section 11550 to perform an under the influence evaluation. Estrada's pupils reacted only slightly or not at all when Forbus shined a flashlight in his eyes, and his pulse was high. Based on these observations, Forbus took Estrada into custody for being under the influence of a controlled substance. The officers emptied Estrada's pockets, finding a coin purse, a cellular phone, and a notebook.

At the police department, Estrada was advised of, and waived, his *Miranda*[4] rights. Forbus administered several physical tests and obtained a urine sample from Estrada, which tested positive for opiates, amphetamine, and THC (tetrahydrocannabinol). The physical tests also indicated that Estrada was under the influence of narcotics and Forbus observed track marks on Estrada's arms. Based on all these factors, Forbus concluded that Estrada abused multiple drugs and was currently under the influence of opiates and amphetamines.

Forbus searched Estrada's belongings and inside the coin purse, he found 17 plastic Ziploc baggies containing what he believed to be heroin. Fourteen of the baggies were small with spade-shaped logos on them, weighing between 0.2 and 0.4 grams. The remaining three baggies were larger, had no logos and weighed between 0.6 and 0.7

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436.

grams.  Forbus selected one of the 17 baggies at random and the substance inside tested positive for the presence of opiates.

Forbus found $35 in Estrada's wallet and $100 inside an envelope in his inner coat pocket.  Inside the notebook, Forbus found "pay-and-owe sheets" that contained different people's names with a number assigned to each name.  These documents indicated to Forbus that Estrada was selling drugs and "keeping business records of the client base . . . ."

After Forbus told Estrada he believed he was under the influence of opiates and amphetamines, Estrada said he had used heroin about 9:30 that morning.  He said he typically uses about 0.3 to 0.5 grams twice a day.  Estrada denied that the money recovered from his person was from drug sales.

A forensic toxicologist testified that subsequent laboratory tests confirmed the presence of methamphetamine and amphetamine in Estrada's urine.  A criminalist testified that she analyzed the substance found in three of the Ziploc baggies[5] and determined that it was heroin with a net weight of 1.03 grams.

On November 22, 2011, while Estrada was an inmate at the jail, a correctional officer strip searched him.  In Estrada's anal cavity, the officer found a substance wrapped in plastic wrap that tested positive for heroin.  After Estrada was advised of his *Miranda* rights, he admitted that the substance was heroin.

Santa Cruz Police Officer Bill Azua testified as an expert on heroin use and sales and opined that Estrada possessed the heroin found on his person for the purpose of sale. Azua based his opinion on several factors, including the spade design on some of the baggies that identified the type of heroin inside, and the consistency of weight in each of the baggies.  In addition, the pay-owe sheets in Estrada's notebook contained numbers

---

[5] The criminalist selected two of the smaller baggies and one of the larger baggies for analysis.

4

consistent with the street price of heroin. Azua also testified that drug sellers usually keep money in separate locations on their person, in case they are robbed. He also found it significant that Estrada had two knives, believing one was concealed "in case bad things happen during the transaction."

### B. Defense case

Santa Cruz County Correctional Officer Sammy Medina testified he conducted a strip-search of Estrada on November 22, 2011, as Estrada was being booked into jail. Medina noticed a foreign object in Estrada's anal cavity which he asked Estrada to remove. Estrada did so and dropped a round black object, wrapped in clear plastic, on the floor. The substance was later found to be heroin.

Julian Mendoza testified that Estrada, with whom he has been friends for 25 or 30 years, sometimes worked for him doing tree work when Estrada needed extra money. He said Estrada did some work for him around March 2011.

### C. Verdict and sentencing

The jury found Estrada guilty as charged. On April 12, 2012, the court imposed a sentence of 36 months probation and 300 days in county jail on these charges. At his sentencing hearing, Estrada also pleaded no contest to charges filed in a separate case (Sup. Ct. Santa Cruz County, 2012, No. F21845) of bringing drugs into the jail facility (Pen. Code, § 4573) and being in possession of an illegal controlled substance in a jail facility (*id*., § 4573.6), in exchange for 36 months probation and 180 days jail time that could be completed in an outpatient residential treatment program.[6]

---

[6] Estrada also pleaded no contest to a trailing charge (Sup. Ct. Santa Cruz County No. M60504) of petty theft in exchange for a one day concurrent jail sentence. In accordance with the plea agreement, the trial court granted the People's motion to dismiss an additional misdemeanor count in case No. M60504 as well as a second trailing case (Sup. Ct. Santa Cruz County No. M63526) in its entirety in the interests of justice.

5

## II. DISCUSSION

Estrada raises two issues on appeal: (1) the People committed a *Brady* violation by failing to turn over a CAD (computer aided dispatch) log which would have shown his initial detention was unduly prolonged and the subsequent arrest and search were thus unlawful; and (2) the trial court failed to award conduct credits pursuant to Penal Code section 4019.

### A. *Facts relevant to Estrada's motions to suppress*

Prior to the December 2011 preliminary hearing, Estrada filed a motion pursuant to Penal Code section 1538.5 to suppress all evidence obtained as a result of his warrantless detention, search, and arrest. The motion was premised on Estrada's contention that his detention was unduly prolonged since it exceeded the time necessary for him to be cited for a traffic violation.

At the preliminary examination, Forbus said somewhere between five and 10 minutes elapsed as he conducted his infield evaluation of Estrada after noticing the symptoms that he was under the influence of a controlled substance. On cross-examination, he said "I don't think we were out there for honestly more than ten minutes but I don't know."

After the motion to suppress was argued, the trial court denied it, stating "I don't believe based on everything I heard from Officer Forbus that he was on some sort of fishing expedition here. This was all happening concurrently and I think--he testified that as he encountered the subject he calls in for the warrant check and was waiting for a response from dispatch while he was engaged in all of these other activities. There was nothing about the communication with dispatch that prolonged anything here."

Prior to trial, Estrada filed a renewed motion to suppress evidence, again arguing his detention was unduly prolonged. At the hearing on the motion, Estrada's counsel moved to introduce into evidence a "CAD log of the radio traffic that transpired during the detention." Defense counsel had not received this log until a week and a half prior to

6

the hearing on the renewed motion and argued it "certainly would have been germane" to the initial motion to suppress had it been discovered prior to the hearing on that motion.

Estrada's counsel argued the log demonstrated "that there was a 20-minute span of time between the initial contact" and Estrada's arrest for being under the influence. Therefore, it supported the defense theory that "this was an unduly prolonged detention given that the officer merely didn't write a citation for riding a bicycle the wrong way down a one way street. . . . I think we can all agree that it wouldn't take anybody more than one minute probably to complete the Information [*sic*] called for in that citation."

The prosecutor told the trial court the People had not received a specific request for the CAD log from defense counsel until January 9, 2012, "well after the preliminary hearing." Estrada's counsel responded that a general request for discovery was made in April 2011 and was "inclusive of any information that is either evidence of guilt or innocence" in Estrada's case.

Ultimately, the trial court "decline[d] to receive" the CAD log. The trial court found it was a document the defense should have obtained prior to the preliminary examination "[g]iven the length of time between the arraignment and the initial scheduling of the motion to suppress."[7] Relying on the preliminary hearing transcript as the factual basis, the court denied Estrada's renewed motion to suppress, finding "there was nothing that was done by the officer . . . to prolong the detention for the purposes of finding some evidence of criminal conduct." Rather, "these were all reasonable steps taken in connection with the writing of the citation including the *Terry*[8] pat-down search . . . and while all of this was occurring the officer noted objective symptoms of . . . the use of narcotics."

_____

[7] While the trial court declined to receive the CAD log, it agreed that the log, marked as exhibit A, would be a part of the trial court record. The log was made a part of the record on appeal by way of augmentation.

[8] *Terry v. Ohio* (1968) 392 U.S. 1.

7

*B.*     *Overview of* Brady

The Due Process Clause of the federal Constitution requires that the prosecution disclose to the defendant information that is both material and exculpatory. (*Brady*, *supra*, 373 U.S. at p. 87.) "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282.) The *Brady* rule "encompasses evidence 'known only to police investigators and not to the prosecutor.' [Citation.] In order to comply with *Brady*, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.' " (*Id.* at pp. 280-281.)

The People have a duty to disclose any favorable and material evidence even without a request by the accused. (*Brady*, *supra*, 373 U.S. at p. 87; *In re Sassounian* (1995) 9 Cal.4th 535, 543.) Evidence is " 'favorable' " under *Brady* "if it either helps the defendant or hurts the prosecution, as by impeaching one of its witnesses." (*In re Sassounian*, *supra*, at p. 544.) Evidence is material, where there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." (*United States v. Bagley* (1985) 473 U.S. 667, 682.)

On appeal, the defendant has the burden to establish the elements of a *Brady* violation. (*Strickler v. Greene*, *supra*, 527 U.S. at pp. 289, 291.) A court reviewing a suspected *Brady* violation independently reviews the question of whether a *Brady* violation has occurred but gives "great weight to any trial court findings of fact that are supported by substantial evidence." (*People v. Letner* (2010) 50 Cal.4th 99, 176.)

C.     *The People's disclosure obligations prior to the preliminary examination*

In their responding brief, the People cite *United States v. Ruiz* (2002) 536 U.S. 622 (*Ruiz*), for the proposition that *Brady* does not require the production of impeachment evidence to the defense before the preliminary examination and hearing on the suppression motion.

*Ruiz* is distinguishable, as it addressed the question of whether prosecutors were obligated to provide impeachment evidence to a defendant before entering into a plea agreement.  (*Ruiz*, *supra*, 536 U.S. at p. 625.)  In this case we are confronted with whether or not impeachment evidence should be turned over to a defendant prior to a preliminary examination and/or a hearing on a motion to suppress.

This distinction is important.  "A defendant who has pleaded not guilty and will have a preliminary hearing occupies a vastly different position than one who is considering waiving his or her constitutional rights and admitting guilt pursuant to a preindictment plea offer."  (*Bridgeforth v. Superior Court* (2013) 214 Cal.App.4th 1074, 1086 (*Bridgeforth*).)  "Preliminary hearings . . . serve to protect both the liberty interest of the accused and the judicial system's and society's interest in fairness and the expeditious dismissal of groundless or unsupported charges, thereby avoiding a waste of scarce public resources.  Requiring prosecutorial disclosure of information that is both favorable to the defense and material to the magistrate's determination of 'whether there exists probable cause to believe that the defendant has committed a felony' ([Pen. Code,] § 866, subd. (b)) provides a valuable additional safeguard for these extremely important interests."  (*Id.* at p. 1087.)

As *Bridgeforth* notes, however, the right to disclosure of information prior to the preliminary examination is not without limitation.  Rather, "the precise scope of a defendant's due process right to disclosure and the determination of whether that right has been violated are necessarily tailored to the context and purpose of the preliminary hearing.  [Citations.]  Accordingly, the standard of materiality is whether there is a

9

reasonable probability that disclosure of the exculpatory or impeaching evidence would have altered the magistrate's probable cause determination with respect to any charge or allegation." (*Bridgeforth*, *supra*, 214 Cal.App.4th at p. 1087.)

The People also suggest that Estrada's *Brady* claim must fail because the information regarding the length of the encounter was either already in Estrada's possession (because Estrada likely had first-hand recollection of its duration) or was readily available to the defense had it acted with due diligence. We think these suggestions improperly place too much of a burden on the defense. It should not be incumbent on the defendant to take the witness stand in order to rebut a police officer's testimony regarding the length of their encounter, especially when documentary evidence reflecting the length of that encounter is in the possession of the prosecutor or others acting on behalf of the prosecution in the case.

### D. *The CAD log was not material and no prejudice resulted from its nondisclosure before the preliminary examination*

In this case, we are not deciding if the CAD log would have directly called into question the magistrate's probable cause determination. Instead, we are considering a prior, foundational question--namely whether the CAD log either shows an unduly prolonged detention on its face or if it sufficiently impeaches Forbus' testimony on the duration of the encounter such that there is a reasonable probability the magistrate would have granted Estrada's motion to suppress. If so, then the magistrate would necessarily have found no probable cause existed to hold Estrada on the charged offenses as there would be no admissible evidence of Estrada's narcotics usage or possession of narcotics for sale.

Estrada argues that the CAD log establishes his detention was unduly prolonged since it shows he was detained for approximately 18 minutes rather than the five to 10 minutes Forbus testified to at the preliminary examination. Since this 18-minute detention exceeded the time required to issue a citation for riding his bicycle the wrong

10

way, it was illegal and the motion to suppress should have been granted. In support of this argument, Estrada relies principally on *People v. McGaughran* (1979) 25 Cal.3d 577 (*McGaughran*).

In *McGaughran*, *supra*, 25 Cal.3d 577, the officer stopped the defendant for driving the wrong direction on a one-way street. (*Id.* at p. 581.) The initial detention lasted three to four minutes, during which time the officer questioned the defendant and examined his driver's license. (*Ibid.*) The officer did not issue a citation, but returned to his patrol car and then radioed for a warrant check which took approximately 10 minutes to complete, revealing defendant's outstanding burglary warrant. (*Ibid.*) On appeal from the denial of his motion to suppress and eventual conviction, the California Supreme Court ruled the defendant's second detention to run the warrant check was unlawful and the resulting evidence should have been suppressed. (*Id.* at p. 586.)

This case is readily distinguishable from *McGaughran*. Estrada was initially detained because he was riding his bicycle the wrong way on a one-way street. Like the traffic violation in *McGaughran*, the infraction at issue was minor. However, unlike the defendant in *McGaughran*, Estrada was armed, a fact which necessarily prolonged the initial encounter with Forbus and his trainee officer. As Forbus secured the first knife and then conducted a pat search when Estrada began to reach for his second knife, he observed Estrada was sweating profusely, yet his hands were cold and clammy. It was at this point that Forbus suspected Estrada was under the influence of narcotics and he began questioning him to determine if there was some other explanation for these symptoms, questioning which further prolonged the initial detention. The evidence of Estrada's narcotics usage was in plain sight, whereas the police officer in *McGaughran* had no objective indication that the defendant had an outstanding warrant.

Furthermore, the CAD log's utility as impeachment evidence is limited. Forbus testified at the preliminary examination that it took "between five and ten minutes" from when he noticed Estrada's physiological symptoms to when he completed his section

11

11550 evaluation. On cross-examination, Forbus said he did not "think we were out there for honestly more than ten minutes *but I don't know*." (Italics added.) According to the CAD log, approximately 18 minutes elapsed between the time Estrada is first stopped (14:33:06 on the log) and the point at which the log indicates he is detained for being under the influence (14:51:41 on the log). This discrepancy of eight or perhaps 10 minutes is insufficient to establish a reasonable probability that the magistrate would have found the detention was unduly prolonged and therefore unlawful. Accordingly, we find no *Brady* violation under these circumstances.

### E. *Penal Code section 4019 credits*

The trial court determined that Estrada was entitled to 147 days credit for time actually served. The trial court, however, failed to specify conduct credits, nor were conduct credits referenced in the probation report. Because Estrada committed his offenses in March 2011, he was entitled to two days of conduct credit for every six days spent in local presentence custody. (Pen. Code, § 4019; Stats. 2010, ch. 426, § 2, eff. Sept. 28, 2010.) The People concede this issue, and we agree the concession is appropriate.

Because Estrada received 147 days of custody credit, he was entitled to 72 days of conduct credit, for a total of 219 days credit. We will direct that the abstract of judgment be modified accordingly.

**III.   DISPOSITION**

The abstract of judgment is modified to reflect that Estrada shall receive presentence credits of 147 days of custody credits plus 72 days of conduct credits for total presentence credits of 219 days.  As modified, the judgment is affirmed.


                                                        _____
Premo, J.

WE CONCUR:


_____
Rushing, P.J.


_____
Elia, J.