Filed 12/10/21  P. v. Garcia CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H046909 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. F1557428) |
| v. | |
| MANUEL ROCHA GARCIA, | |
| Defendant and Appellant. | |

In September 2018, defendant Manuel Rocha Garcia was convicted by jury trial of committing lewd and lascivious acts upon a child under the age of 14 years (counts 1-9; Pen. Code, § 288, subd. (a))[1] and oral copulation or sexual penetration with a child 10 years of age or younger (§ 288.7, subd. (b)).  The jury found true allegations as to the lewd act counts that defendant committed those acts against more than one victim (§667.61, subds. (b), (e)).  The trial court found true that defendant had suffered a prior strike conviction (§§ 667, subds. (b)-(i), 1170.12) and a prior conviction for a serious felony (§ 667, subd. (a)).  The court sentenced defendant to an aggregate term of 300 years to life consecutive to 50 years in state prison.

On appeal, defendant argues that the trial court abused its discretion by ruling that his prior bad acts would be admissible on rebuttal if defendant testified at trial, which defendant asserts dissuaded him from testifying.  He also argues that the court erred by admitting Child Sexual Abuse Accommodation Syndrome (CSAAS) evidence, and by

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

failing to sua sponte instruct the jury on the permissible uses of CSAAS evidence. Finally, he argues that the cumulative effect of these errors warrants reversal. We affirm the judgment.

I.     **BACKGROUND**

A.     *Prosecution's Case*

1.     *A.'s Testimony* (*counts 1-4*)

A., who was born in 2000, was 18 years old at the time of trial. She has three younger brothers, M., N., and J. She identified defendant as her grandfather and testified to four instances of sexual abuse.

The first instance occurred when A. was 11 years old. A. was recovering from hip surgery. The recovery was painful and long, and she could not do daily living activities like get dressed or walk on her own. Defendant supervised A. and her siblings. One day, A. needed help getting out of the shower and drying herself. Defendant helped her dry off and then moved his hands to A.'s bare breasts and massaged them in a circular motion. At some point, A. was partially dressed, wearing underwear. Defendant "slowly ma[d]e his way down and then touch[ed] [A.'s] vagina and . . . thighs." Defendant "slipped his hand under [her] underwear and started massaging and touching [her] vagina."

The second instance occurred on an occasion when A. was getting dressed. Defendant came into the room. He sat down next to her and started rubbing her thigh, arms, and body in a "caressing" or "massaging" circular motion. He then touched her bare breast and vagina, both over and under her underwear. A. was wearing only underwear at the time. A. was confused but "didn't know this was bad at the time."

The third instance occurred when A. was about 12 years old. Defendant was living in the garage of A.'s home at the time. A. and her brothers went to the garage to watch television. At some point, her brothers left, and A. was alone with defendant. Defendant sat next to A. and began talking with her. He proceeded to touch her on her

2

outer thigh before making his way to her inner thighs, vagina, and breasts. Defendant first touched A.'s vagina over her shorts, but then he "slipped his hand under the inbuilt shorts and started rubbing [her] bare vagina." He also touched her breasts under her clothes.

The fourth and final instance occurred when defendant was driving A. in his car, a Ford Bronco. A., who was in middle school at the time, was sitting in the front passenger seat. As they travelled to the grocery store, defendant reached with his right hand to A.'s thigh, and began rubbing the outer thigh before moving to her inner thigh. Defendant then started massaging A.'s vagina over her clothes. This occurred "around five times" on different car trips. In addition, on at least five occasions in the car, defendant would rub A.'s arms and back, and massage her breasts. On cross examination, A. testified that it was generally considered "a privilege" to sit in the front seat, because when she and her siblings rode in the car, whoever rode in the front seat "got to control the radio."

2. *A.'s Initial Disclosures*

When A. was in seventh or eighth grade, someone spoke at A.'s school about sexual harassment and sexual abuse. After the presentation, A. disclosed to her friends that her "grandpa does this to me. Like, is that bad?" Her friends told her she "should talk to someone about it . . . ." According to one of the friends, who testified at trial, A. "was crying a lot" and "couldn't stop" when she made the disclosure. When A. made the disclosure, she told her friend, " 'You can't tell anyone,' because now that I know this is bad, this can ruin a lot of things and I don't want to ruin anything."

During her sophomore year of high school, A. told her boyfriend "briefly, not detailed, about what happened with [her] grandfather." A. told him not to tell anyone "[b]ecause it's been hidden for so long." She "was scared that when the secret came out everything was going to fall apart."

At some point, A. began to write in a diary. The diary was intended to be private. In it, she wrote about defendant's sexual abuse. In September 2015, A. became aware

3

that her mother had read her diary. When first asked by her mother, A. denied that what she had written in the diary was true. She did so because she was scared and worried she was going to be in trouble.

Later that day, A. spoke with a family friend, with whom A. was particularly close. The family friend attempted to speak with A. while A.'s mother was in the room, but A. said she did not want to talk with her mother in the room. A.'s mother left the room, and A. and the family friend spoke. The family friend informed A. that because of her position, she was a mandated reporter and would have to report any allegations of sexual abuse to the police. Initially, A. did not want to involve the police. After the family friend explained the process, however, A. disclosed to the family friend that defendant had molested her over a course of years. A. reported that, in the beginning, defendant would touch her on the leg and put his hand on her lap. Eventually, defendant started to squeeze A.'s legs, grab her bottom, kiss and bite her neck, and touch her crotch over the clothes. A. testified that she told the family friend an incomplete version of events, telling her "little bits" and "stuff . . . to make the situation seem smaller than it was," in the hopes that "we can sweep it under the rug and don't talk about it."

After the conversation, the family friend immediately told A.'s parents what A. had said. A. then admitted to her mother that what she had written in the diary was true. The family friend and A.'s parents then went immediately to the police department to report the sexual abuse.

### 3. *M.'s Testimony* (*counts 5-8*)

M., who was born in 2001 and was 17 years old at the time of trial, testified that the first time defendant acted inappropriately towards him was when defendant instructed M., who was 6 years old at the time, to come to his room to use defendant's cellphone to take photos of defendant. M. described his relationship with defendant as "pretty good" at that time, and he considered himself close to his grandfather. Defendant started out

4

clothed but then took his clothes off while M. continued to take pictures. Defendant was eventually completely naked. Nothing else happened during the first incident.

Over the next two years, defendant had M. take photos of him about eight more times. At some point, defendant instructed M. to remove his own clothes during the photo sessions. This instruction made M. "a little uncomfortable", but he complied because he "was taught that you need to respect your elders and listen to them."

On one occasion, when M. was seven or eight years old, defendant, began to rub M.'s penis with his hand. Defendant had an erection. What defendant did made M. "uncomfortable" and "it didn't really feel right . . . ." However, M. had not been taught it was wrong for someone to touch him in that manner and he trusted defendant.

On one or two other occasions, defendant placed M.'s hand on defendant's erect penis. Defendant guided M.'s hand to rub defendant's penis in a "back and forth" stroking manner. Eventually, defendant released his hand. M. continued to touch defendant's penis but "didn't think it went on for a long time afterward . . . ."

The next incident occurred when M. was 12 years old. M., and his younger brother N. (who was two or three years old at the time), were spending the night at a relative's house under defendant's supervision. M. woke up in the middle of the night to find defendant's hand inside his (M.'s) pants, over his penis but above his boxer shorts. M. "felt very anxious and uncomfortable." It also triggered memories for M. of the things that defendant had done to him when he was younger. When M. asked defendant what he was doing, "he said he was trying to find [N.'s] baby bottle, and then he took his hands out, and then that was it."

### a.      M.'s Initial Disclosure

The day after A.'s diary was discovered, M.'s mother asked M., who was then 14 years old, whether defendant had done anything to him similar to what defendant had done to A. "[H]e just started crying and saying he was scared to say something yesterday, but that his grandfather had been molesting him for a very long time."

5

As M. told his mother about the molestations, "[h]e was scared," "he was sad," and he was crying. M. had not planned to ever tell anyone about the abuse but when he "finally told everybody," he felt "sort of relieved" but also it "hurt [him] inside."

### b. M.'s False Allegation

M. admitted that in 2016, when he was 15 years old, he used an application called Grindr to meet an 18-year old man to engage in consensual sexual conduct. After his parents found out, he falsely told them he had been abducted and forced to engage in sexual conduct. The allegation was reported to the police. Surveillance footage was eventually recovered as part of the investigation, which showed M. getting into the person's car voluntarily. In a subsequent interview with police, M. admitted to lying that the sexual conduct was forced. M. testified that he lied because he felt like what he had done "conflicted with" his upbringing as a Christian—"avoid[ing] homosexuality and sex when you're not married."

### 4. Testimony about Abuse of N. (*counts 9 and 10*)

A. testified that when N., who was born 2012 and was five years old at the time of trial, was between five months and two years old, she would see defendant "play and bite and nibble on [N.'s] penis" whenever he would change N.'s diapers or dress him after a bath. Before putting on N.'s diaper, defendant "would . . . nibble and bite [N.'s] penis and move it with his lips and motorboat it." A. clarified that defendant would put N.'s penis in his mouth. This happened "[w]ay too often," more times than A. could count. On other occasions, she would see defendant use his hands to touch N.'s penis—specifically using his hands to "wiggle" and "flip" N.'s penis. A. would tell defendant to stop, and tell him that it was not right. Defendant responded by telling her, " 'He's my grandson. It's a grandpa and grandson sort of thing. It's our thing. Go away. You wouldn't understand it,' because he described it as 'This is our bond. This is what we do.' "

M. testified that he saw defendant put his mouth on N.'s penis on multiple occasions during diaper changes, when N. was two or three years old. Defendant would say things like, " 'Peek-a-boo' " or " 'Wee-wee' referring to [N.'s] penis. And he would motorboat the . . . pelvis area near the stomach and on [N.'s] penis and making sounds with it." M. clarified that he would see defendant's lips on N.'s penis. This happened often, "[e]very time we were on towels and my grandpa was changing him." M. also saw defendant touch N.'s penis with the "palm area" of his hand. After about the third time M. saw defendant put his mouth on N.'s penis, M. told his parents about it. After telling his parents, M. felt like they did not take him seriously. His father confirmed in his testimony that he "didn't take it serious" when M. told him about it.

J., who was born 2002 and was 15 years old at the time of trial, testified that when N. was about one year old, he saw defendant "blow on . . . make farting noises . . . on [N.'s] penis." Defendant's lips would touch the tip of N.'s penis. J. estimated that defendant would change N.'s diaper "three to five times a day," and he would touch N.'s penis as described the "[m]ajority of the time." Defendant would say things "like, 'pee-pee,' like, over and over." Defendant would say it "in a high pitch voice trying to make it funny," but J. "thought it was kind of weird still." Sometime after A.'s diary was discovered, J. disclosed what he had seen happen to N.

### 5. CSAAS Testimony

Dr. Blake Carmichael testified as an expert on CSAAS. Dr. Carmichael affirmed that he had not conducted any investigation in this case; had not interviewed any witnesses or read any reports or transcripts; and did not know the specific charges in the case or even the police agency involved.

Dr. Carmichael explained that CSAAS "is . . . an education tool" that "helps describe a lot of the dynamics that occur within a sexual abuse relationship." It does so by "dispel[ling] some of the notions that people may have about kids who have been sexually abused." Dr. Carmichael related that there are five categories to CSAAS:

7

secrecy; helplessness; entrapment or accommodation; delayed and unconvincing disclosure; and recanting or retraction. Dr. Carmichael explained, however, that all five categories are not present in every single case of child sexual abuse. He emphasized that the categories do not represent a "test" or "checklist," and that CSAAS cannot be used "to say that [a] kid was abused."

With regard to secrecy, Dr. Carmichael explained that a child may not tell anyone about their abuse for several reasons. They may fear repercussions to their family; they may feel ashamed; they have been taught to respect authority; and they may think they will not be believed. As for helplessness, Dr. Carmichael testified that this speaks to the power dynamic, where the perpetrator may be in a position of authority or trust, and the child is in a position of dependency. With respect to entrapment or accommodation, Dr. Carmichael explained that this is "really about coping" or "dealing" with the abuse. For example, the child may try to avoid the perpetrator, the child may appear angry or sad, and the child may try to dissociate, meaning "pull . . . away from the actual experience" so the child does not "have to deal with certain things."

As for delayed and unconvincing disclosure, Dr. Carmichael related that children who have been abused often do not tell immediately that they have been abused, with many delaying disclosure until they have reached the age of 18. He added that children often give inaccurate or inconsistent accounts of their past abuse, especially if the abuse happened multiple times or the child disassociated during the abuse. He also noted that children may at first minimize the nature and extent of the abuse when initially disclosing the abuse, and then only later add details about what happened to them. Finally, with regard to recanting or retraction, Dr. Carmichael testified that children who have been sexually abused "can say it happened and then later take it back because of fear[s] of reprisals, because of the concerns about the family reaction . . . there's a lot of reasons why kids can take back valid claims of sexual abuse."

8

## B.    *Defense Case*

Defendant's son testified that he owned a 1996 Ford Bronco.  He testified that when he purchased the car, there was no radio.  He eventually sold the car to defendant.  Defendant never installed a radio in the car.

Daniel Desantis, a private investigator, took measurements of the Ford Bronco.  Desantis measured the distance between the driver's seat and the passenger's seat as 20 inches, with an open space between the two seats.  The width of the driver's seat and passenger's seat was measured as 19 1/2 inches each.  Desantis measured defendant's reach, when sitting in the driver's seat, as 26 inches from the middle of his shoulder blade to the end of his hand.

## II.    DISCUSSION

### A.    *Admission of Prior Rape Allegation*

Defendant argues that the trial court abused its discretion when it ruled that, if defendant testified, the prosecution would be permitted to introduce impeachment evidence of a prior bad act on rebuttal.  The Attorney General contends that defendant forfeited a challenge to the trial court's evidentiary ruling by failing to testify at trial.

### 1.    *Procedural Background*

Defendant's current convictions occurred following a second trial after the first trial of these charges resulted in a hung jury on all counts.[2]  At the first trial, the prosecution moved in limine to admit evidence of defendant's prior sexual assaults against his sister, M.S., under both Evidence Code section 1108 and Evidence Code section 1101 and as rebuttal evidence.  The first trial court denied the motion.

Prior to the start of defendant's second trial, the prosecution again moved in limine to admit evidence of defendant's prior sexual assaults of his sister, M.S., again under

---

[2] The jury reported that it was split 11 to 1 on several counts, with a different split on other counts.  The foreperson reported that the jury was at an "impasse," primarily because they were "hung up on reasonable doubt."

9

Evidence Code sections 1108 and 1101. The prosecution also argued that the evidence should be admissible as impeachment evidence if defendant testified "that the three victims are lying and colluding to get [d]efendant in trouble . . . ."

The prosecution offered the following description of the prior offenses: "Defendant committed prior acts of sexual assault against his sister [M.S.] when she was between the ages of eight and eleven years old and he was between the ages of seventeen and twenty. . . . [¶] During these sexual assaults [d]efendant drove [M.S.] to Anderson Dam. Defendant parked the car and removed [M.S.'s] clothes. Defendant got on top of [M.S.] and raped her by putting his penis in her vagina. Defendant also made [M.S.] touch his penis with her hands and perform oral sex on [d]efendant. Defendant offered [M.S.] money, but she said no. Defendant threatened to kill her whole family if she told anyone. [¶] Defendant also committed acts of sexual assault on [M.S.] at their home. Defendant would rape her, force [M.S.] to perform oral sex, and sometimes perform oral sex on [M.S.]. After [d]efendant would rape [M.S.] there would be blood on the sheets. The sexual assaults occurred about two to three times per week. Defendant told [M.S.] that if she told, no one would believe her because he is older than she is and if they did believe her, [d]efendant would kill them. [¶] At one point, [M.S.] told her mother about the rape, but her mother did not believe her. Her mother never reported this to the police and never supported her. The sexual assaults stopped when [M.S.] was around eleven. She believes they stopped because [d]efendant thought [M.S.] was old enough to tell someone what he had been doing."

The second trial court determined that the evidence would not be admissible in the prosecution's case-in-chief, but would be admissible as rebuttal evidence if defendant testified.[3] The court found that it was admissible under Evidence Code sections 1108 and 1101, and that Evidence Code section 352 did not preclude admission. The court stated,

---

[3] A different trial judge presided over the second trial.

however, that it intended to sanitize portions of the evidence "that ha[d] the potential to cause more of an emotional reaction than the charged crimes."

At the second trial, defendant decided not to testify. Defense counsel stated: "I have talked to my client, and [defendant] has informed me that he made the decision to not testify in this case, and I am prepared to rest." The court then advised defendant of his right to testify. The court confirmed with defendant his decision not to testify, and defense counsel stated he concurred in the decision.

### 2. Analysis

It is well established that "[t]o raise and preserve for review the claim for improper impeachment with a prior conviction, a defendant must testify." (*Luce v. United States* (1984) 469 U.S. 38, 43.) This procedural rule was adopted by our high court in *People v. Collins* (1986) 42 Cal.3d 378 (*Collins*). (*Id*. at pp. 383-388.) In *People v. Sims* (1993) 5 Cal.4th 405, the California Supreme Court reaffirmed *Collins* and extended the rule to prior misconduct impeachment evidence. (*Sims*, *supra*, at pp. 453-456.) Thus, a challenge to a request "to exclude impeachment evidence is not reviewable on appeal if the defendant subsequently declines to testify." (*People v. Ledesma* (2006) 39 Cal.4th 641, 731.)

Defendant argues that the trial court abused its discretion by ruling that the prosecution would be permitted to use in its rebuttal the allegation that defendant sexually assaulted his sister. Defendant acknowledges that this claim would normally be subject to forfeiture because he failed to testify. However, he contends that because he testified in the first trial, "this court does not have to speculate as to the nature of [his] testimony," and can evaluate the prejudice in light of that testimony and the prosecution's proffer.

In *People v. Renteria* (1992) 6 Cal.App.4th 1076 (*Renteria*), the defendants challenged the trial court's admission of their prior convictions as impeachment evidence if they decided to testify. (*Id.* at p. 1081.) In his first trial, one of the defendants,

11

Miranda, testified and the trial court allowed the use of his prior rape conviction, in sanitized form, to be used for impeachment purposes. (*Id.* at p. 1079.) The jury was deadlocked and a mistrial was declared. (*Ibid.*) In his second trial, Miranda did not testify and he was convicted. On appeal, Miranda attempted to challenge the decision to allow the admission of the prior rape conviction as impeachment evidence if he testified. He claimed that the ruling dissuaded him from testifying. He claimed that "[b]ecause he testified in his first trial, . . . the *Luce-Collins* rule should not apply." (*Id.* at p. 1081.) He asserted that the "*Luce-Collins* rule only precludes review because of the difficulty in knowing the nature of a defendant's testimony," and that the "court can review his testimony in the first trial to determine the precise nature of what his testimony would have been in his second trial had he testified." (*Ibid.*)

The Court of Appeal rejected Miranda's argument. It noted that "his conviction rests solely on the evidence presented to the jury at his second trial, and not on what was presented in the first trial. The evidence presented at the first trial is totally irrelevant to any review of the record in this case for the purposes of assessing abuse of trial court discretion in its ruling to allow him to be impeached by his 1981 rape prior." (*Renteria*, *supra*, 6 Cal.App.4th at p. 1081.) The court observed that "the *Luce-Collins* rule was adopted out of concern that '[a] reviewing court is handicapped in any effort to rule on subtle evidentiary questions outside a factual context.' [Citation.]" (*Ibid.*) "Moreover, even if Miranda's testimony from the first trial were to be considered as an offer of proof for his testimony in the second trial, as *Luce* and *Collins* both point out ' "his trial testimony could, for any number of reasons, differ from the proffer." [Citation.]' [Citations.] Further, 'the trial court has discretion to make a different ruling as the evidence unfolds.' [Citation.] Any conclusion concerning prejudice in the court's ruling on review would thus be 'wholly speculative.' [Citation.]" (*Id.* at p. 1082.)

As in *Renteria*, defendant in this case is precluded from challenging the admission of impeachment evidence because he did not testify in the trial resulting in his

12

convictions. Defendant's testimony in the first trial is of little use in evaluating any claim of prejudice, as his trial testimony in the second trial could, for any number of reasons, have differed from the testimony he gave at the first trial. Any attempt to review for abuse of discretion the trial court's admission of the impeachment evidence would be wholly speculative, not only because defendant failed to testify but also because the prosecution could have decided not to use the impeachment evidence. The trial court, too, had the "discretion to make a different ruling as the evidence unfold[ed]." (*Collins*, *supra*, 42 Cal.3d at p. 384.) Accordingly, defendant forfeited his challenge to the admissibility of evidence of his prior bad acts when he elected not to testify at the trial resulting in his convictions.[4]

## B.    CSAAS Evidence

Defendant argues that the trial court abused its discretion in admitting Dr. Carmichael's CSAAS testimony. He contends that CSAAS evidence should be inadmissible as a matter of law because it permits the jury to draw an impermissible inference of guilt in violation of his due process rights.

### 1.    Procedural Background

The prosecution moved in limine seeking the admission of the CSAAS evidence. Defendant moved to exclude testimony on CSAAS evidence, arguing that it had no probative value and was unduly prejudicial. The trial court ruled that it would allow expert testimony on CSAAS. At trial, Dr. Carmichael testified about CSAAS as described earlier.

---

[4] Defendant also contends that the trial court's "erroneous ruling" violated his rights under the Fifth and Fourteenth Amendments because the ruling dissuaded him from testifying. As discussed, defendant's challenge to the impeachment evidence is not reviewable as a matter of settled federal and state criminal procedure. Defendant's attempt to raise the same claim as a constitutional claim is unavailing.

*2. Analysis*

"The governing rules are well settled.  First, the decision of a trial court to admit expert testimony 'will not be disturbed on appeal unless a manifest abuse of discretion is shown.'  [Citations.]  Second, 'the admissibility of expert opinion is a question of degree.  The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard. . . .  [E]ven if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would "assist" the jury.  It will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness" '  [citation]."  (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299-1300 (*McAlpin*).)

" '[CSAAS] expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' "  (*McAlpin*, *supra*, 53 Cal.3d at p. 1301.)  The prosecution need not expressly state which evidence is inconsistent with a finding of abuse.  (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745.)  "It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation."  (*Ibid.*)  Admission of CSAAS evidence "is not error merely because it was introduced as part of the prosecution's case-in-chief rather than in rebuttal.  The testimony is pertinent and admissible if an issue has been raised as to the victim's credibility."  (*Id.* at p. 1745.)

In this case, the trial court could have reasonably concluded in its discretion that expert testimony about CSAAS evidence would be helpful to assist the jury by disabusing the jurors of commonly held misconceptions about child sexual abuse victims.  Expert testimony is admissible if it will add to the jury's knowledge about a subject.  As a result of Dr. Carmichael's experience in the field, he had considerably more knowledge

14

than jurors had about the behavior of child sexual abuse victims. Thus, Dr. Carmichael's testimony on this subject would assist the jurors in understanding such behavior.

Further, the evidence raised issues concerning all five categories of behaviors addressed by the CSAAS testimony: the victims' report of abuse did not occur until long after the alleged abuse; the victims reluctantly complied with some of defendant's requests; the victims' description of the abuse was at times inconsistent or unconvincing; after disclosing the abuse in her diary, A. attempted to claim that no abuse had occurred; and the perpetrator was in a position of authority over the children. Dr. Carmichael's testimony gave the jury important background information about how child sexual abuse victims may react to the abuse so that the jury could understand " 'the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*McAlpin*, *supra*, 53 Cal.3d at p. 1301.) We reject defendant's claim that the trial court abused its discretion in admitting the expert testimony on CSAAS.[5]

### C.    CSAAS Instruction

Defendant argues that the trial court had a sua sponte duty to instruct the jurors on the permissible uses of CSAAS evidence, and that its failure to do so was reversible error. Alternatively, he contends that if this court finds that trial counsel had a duty to remind the trial court to instruct with CALCRIM No. 1193, then trial counsel's failure to do so constituted ineffective assistance.

### 1.    Procedural Background

After finding the CSAAS evidence admissible, the trial court indicated its intent to instruct the jury pursuant to CALCRIM No. 1193 [Testimony on Child Sexual Abuse Accommodation Syndrome]. In presenting its instructions to the jury, however, the trial

---

[5] Defendant also relies on a number of out-of-state cases to bolster his argument that CSAAS evidence should be inadmissible for any purpose. Since CSAAS testimony is plainly admissible in California, we need not address defendant's reliance on out-of-state authority.

15

court did not include CALCRIM No. 1193 or any other instruction on CSAAS evidence, and no party pointed out to the court that it had omitted the instruction.

### 2. *Analysis*

"When evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for another purpose, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly." (Evid. Code, § 355.) Generally, "although a court should give a limiting instruction on request, it has no sua sponte duty to give one." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1051.) Failure to request a limiting instruction typically forfeits the issue on appeal. (*People v. Sánchez* (2016) 63 Cal.4th 411, 460.) "We review independently the question of whether the trial court has a duty to give a particular jury instruction." (*People v. Mateo* (2016) 243 Cal.App.4th 1063, 1071 (*Mateo*).)

The Courts of Appeal are divided on whether a trial court is required to sua sponte give a limiting instruction when expert testimony on CSAAS is introduced at trial. In *People v. Housley* (1992) 6 Cal.App.4th 947, 959 (*Housley*), the First Appellate District held "that because of the potential for misuse of CSAAS evidence, and the potential for great prejudice to the defendant in the event such evidence is misused, it is appropriate to impose upon the courts a duty to render a sua sponte instruction limiting the use of such evidence. Accordingly, in all cases in which an expert is called to testify regarding CSAAS we hold the jury must sua sponte be instructed that (1) such evidence is admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested; and (2) the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*Id.* at pp. 958-959.)

However, in *Mateo*, *supra*, 243 Cal.App.4th at p. 1074, the Second Appellate District rejected *Housley*'s holding that a limiting instruction is required whenever there

16

is expert testimony on CSAAS and concluded that "[t]he [limiting] instruction need only be given if requested." (*Ibid.*)

We need not decide whether the trial court had a sua sponte duty to give a limiting instruction on CSAAS evidence. Assuming without deciding that the trial court erred in failing to sua sponte instruct the jury on the limited use of Dr. Carmichael's testimony, we find that any error was harmless under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*Mateo*, *supra*, 243 Cal.App.4th at p. 1074 [applying *Watson* standard of harmless error to trial court's failure to provide limiting instruction on CSAAS evidence].)

As we described previously, Dr. Carmichael's testimony concerned child sexual assault victims as a class. He made it clear in his testimony that he had no knowledge about the facts of the case, he had conducted no investigation in this case, and he had not read any reports or transcripts. He emphasized that CSAAS was merely an educational tool to help understand the dynamics that occur within a sexual abuse relationship. He added, "Some people might expect a kid to say things right away when, in fact, most kids don't. So it's really helping understand people we know or kids who we know have been sexually abused." Finally, he stated unequivocally that CSAAS could not be used to determine whether a child had been abused. Therefore, it was unlikely that the jury would misapply the CSAAS evidence and use it as evidence that the victims were abused. (*Housley*, *supra*, 6 Cal.App.4th at pp. 955-956.)

Furthermore, the evidence against defendant was relatively strong. A. testified in considerable detail about numerous incidents of sexual abuse over a period of several years. A. disclosed the abuse in a private diary and to friends well before disclosing it to her parents or police, and even then was reluctant to do so. M. also testified in considerable detail to a consistent pattern of sexual abuse. As to N., A., M., and J. each testified independently to a number of similar instances of sexual abuse. M., for his part, at one point unsuccessfully tried to alert his parents to the abuse of N. There was no

credible evidence that the victims had a motive to lie about the abuse, or that they had colluded to implicate defendant.

Additionally, the prosecutor did not urge the jury to consider Dr. Carmichael's testimony for an improper purpose during closing argument. During closing argument, the prosecutor referenced Dr. Carmichael's testimony but cited it as evidence that could explain why the evidence was not inconsistent with abuse. In other words, the prosecutor appropriately urged the jury to use Dr. Carmichael's testimony for the legitimate purpose of showing that the victims' reactions as demonstrated by the evidence were not inconsistent with having been molested.

Here, defendant cannot establish that had a limiting instruction been given to the jury, it is reasonably probable that he would have received a more favorable verdict. (*Mateo*, *supra*, 243 Cal.App.4th at p. 1074; *Watson*, *supra*, 46 Cal.2d at p. 836.) Accordingly, we conclude that defendant was not prejudiced by any error in the trial court's failure to instruct the jury on how to use Dr. Carmichael's testimony.

Defendant also argues that if this court holds that trial counsel was required to remind the trial court to instruct with CALCRIM No. 1193, then trial counsel's failure to do so constituted ineffective assistance. Since we do not consider whether trial counsel was required to do so, but rather assume error and find it harmless under the applicable standard, we do not address defendant's ineffective assistance of counsel claim.

### D.     Cumulative Error

Defendant contends that the cumulative prejudice from the trial court's erroneous admission of Dr. Carmichael's testimony, failure to provide a limiting instruction on how to use that testimony, and ruling that impeachment evidence would be admissible should he testify, warrants reversal of his convictions. "[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) In this case, we assumed that even if the trial court erred when it failed to sua sponte give a

18

limiting instruction on Dr. Carmichael's expert testimony, any error was harmless. We rejected defendant's claim that the trial court erred when it admitted Dr. Carmichael's testimony, and we found that defendant waived any challenge to the court's ruling that evidence of prior bad acts would be admissible if he testified. Thus, in the absence of more than one error, defendant's claim of cumulative prejudice fails. (*People v. Watkins* (2012) 55 Cal.4th 999, 1036.)

## III. DISPOSITION

The judgment is affirmed.

_____

ELIA, ACTING P.J.



I CONCUR:




_____

BAMATTRE-MANOUKIAN ELIA, J.






*People v. Garcia*
H046909

Lie, J., Concurring in the Judgment:

I join the majority's analysis and conclusions with respect to the admission of expert testimony on Child Sexual Abuse Accommodation Syndrome and the absence of a sua sponte limiting instruction as to that testimony. As to the trial court's in limine order admitting prior acts evidence under Evidence Code section 1108[1] in the event Garcia were to testify, I write separately because I do not believe that our review of the merits is proscribed by *People v. Collins* (1986) 42 Cal.3d 378 (*Collins*).

In *Collins*, *supra*, 42 Cal.3d 378, a divided Supreme Court adopted the federal rule of procedure articulated in *Luce v. United States* (1984) 469 U.S. 38 (*Luce*)—that the denial of a motion to exclude a defendant's prior conviction offered for impeachment is not reviewable on appeal if the defendant fails to testify. A plurality expressly endorsed *Luce*'s three-part rationale: that (1) without the defendant's testimony, the " 'subtle evidentiary question' " of admissibility under section 352 would be without " 'factual context' " (*Collins*, *supra*, at p. 384) for trial court and reviewing court alike; (2) the trial court might "make a different ruling" as the defendant's testimony "unfolds" before the jury (*ibid.*); and (3) on appeal, a reviewing court "cannot intelligently weigh the prejudicial effect of [any] error if the defendant did not testify." (*Ibid.*)

None of the concerns informing the *Luce-Collins* rule are implicated on this record, however. Garcia's testimony in his first trial, on both direct and cross-examination, is before us in the record on appeal. We have no reason to doubt that Garcia, having flatly denied both act and intent in the first trial, would have done the same on retrial, but for the different trial judge's different evidentiary ruling. Nor have we any basis to doubt the prosecution's commitment to use the evidence to the extent permitted: it was, after all, the prosecutor's own motion in limine to admit the prior acts evidence in her case in chief that was the occasion for the trial court's more limited

---

[1] Undesignated statutory references are to the Evidence Code.

ruling. And the trial court was explicit that its rationale for its conditional ruling was to prevent Garcia from denying guilt while cloaked in "a false aura of veracity." The trial court's ruling to admit the prior act evidence was therefore contingent on the mere fact of Garcia's putting his credibility at issue by testifying, not on the precise content of that testimony, absent a confession. There is therefore no reason to intuit the possibility that something in Garcia's testimony would move the prosecutor or the trial court to relinquish their respective stated intentions.

Applying the *Luce-Collins* rule, the reviewing court in *People v. Renteria* (1992) 6 Cal.App.4th 1076 (*Renteria*) rejected defendant Miranda's contention that the availability of his testimony in the initial mistrial made it practicable to reach the merits of his claim that his prior conviction, admitted as impeachment, should have been sanitized. The court found the prior testimony to be irrelevant to its review, because "Miranda . . . fails to recognize his conviction rests solely on the evidence presented to the jury at his second trial, and not on what was presented in the first trial." (*Renteria*, *supra*, 6 Cal.App.4th at p. 1081.) But the same could be said as well where the court is called to evaluate a claim that the trial court abused its discretion by *excluding* evidence. In that analogous context, we would deem the claim of error as to the trial court's ruling to be forfeited only where the record does not adequately disclose what the excluded evidence consisted of. (Cf. § 354; *People v. Adams* (1988) 198 Cal.App.3d 10.) We know how Garcia would have testified, we can reliably infer that the trial court would not have reconsidered its ruling based on some new detail that Garcia might have added to his general denial of the conduct charged or of any sexual interest in his grandchildren, and we know from the prosecution's detailed offer of proof what M.S. was prepared to testify to. Because, on this record, I believe there would be no impediment to our reviewing the trial court's resolution of this evidentiary dispute, I would respectfully decline to follow *Renteria*.

2

For these reasons, I would reach the merits of Garcia's claim. But because the trial court acted within its broad discretion in concluding that the challenged evidence was admissible under section 1108 notwithstanding operation of section 352, I conclude that it committed no error.

_____
LIE, J.

*People v. Garcia*
**H046909**